45 So.2d 298

**THORNTON v. STATE.**

**6 Div. 989.**

Supreme Court of Alabama.

March 23, 1950.

Young & Young, of Vernon, and Curtis, Maddox & Johnson, of Jasper, for appellant.

A. A. Carmichael, Atty. Gen., and Jas. T. Hardin, Asst. Atty. Gen., for the State.

BROWN, Justice.

The defendant Pierce W. Thornton was indicted by the grand jury duly impaneled in the Circuit Court of Lamar County at the October Term, 1948 for murder in the first degree, the indictment charging in a single count, "That Pierce W. Thorton, alias P. W. Thornton, unlawfully, and with malice aforethought, killed John D. Taylor, by shooting him with a pistol, against the peace and dignity of the State of Alabama."

The defendant was arraigned on said indictment at the July Session of the Circuit Court of Lamar County on Wednesday, July 14, 1949, and being called on to plead, pleaded "not guilty" and his case was set for trial on July 27, 1949. On the trial the defendant was convicted of murder in the first degree, the jury fixing his punishment at life in the penitentiary. From the judgment entered on the verdict he appeals.

While the case as presented to the jury rests upon circumstantial evidence, some of the circumstances developed in the evidence pointing to the defendant's guilt are without dispute. The deceased in life was engaged in the mercantile business at Belk in Lamar County. His wife was the Post Mistress and the Post Office was located in deceased's store. Part of the store had been converted into a small apartment wherein deceased and his wife lived with their child.

On September 4, 1948, the defendant came to the store of deceased and, as the testimony offered by the state goes to show, deceased stated that he was going to Fayette and asked if anybody wanted to ride with him. Defendant and one Dodson who were in the store got in the car and they went to Fayette together and afterwards returned to Belk. The defendant paid a small account at the store, returned to his home a short distance from Belk, but just how far the evidence does not show. About 8:30 that night deceased made a statement to his wife, to quote her testimony: "He tole me he was going to Mr. Thornton's house. That he had loaned him $700 to buy some whiskey Mr. Thornton was to take from a relative, and after he let him have the money, within thirty minutes afterwards, he was sorry he did. He said he didn't want to get mixed up in it and said, 'I am going over there and stay around a while and if they don't bring it in, I am going to try to get my money back and not have any more to do with it. Don't let anybody know about it and be sure not to let my Daddy know about it. * * *." He said "Mr. Thornton promised to pay him the $700.00 and give him $300.00 if he would help him out and let him have the money.

The statement, according to the testimony of Mrs. Taylor, was made just a short time before he left and while preparing to start on the journey to Thornton's

house. That is the last time she saw her husband alive.

The evidence further shows that the deceased left Belk at about 8:30 at night and is without dispute that he went to Thornton's house and arrived their shortly after that time and had a conversation with Thornton.

After the deceased failed to return to his home on Sunday, late in the afternoon, a search was begun by Mrs. Taylor and others and just before dark they found deceased's automobile standing in the road in front of the house on "the Rowland place," a vacant house located about a mile and a quarter or a mile and a half in a westerly direction from Thorton's home. Later on they located deceased's dead body under the well shed back of the house. There was a gunshot wound in the back of deceased's head made, as the evidence shows, with a 38 caliber pistol. The body was lying under the well shed leading from the back porch to the well with the head resting on the steps to the porch. There was a pool of blood on the back porch and some had run through the cracks in the floor to the ground. There was also blood on the face of the deceased and on his clothes and on the ground where he was lying. One of his knees was pulled up, the foot resting on the ground and right under this part of the body was a track made by a boot or shoe showing the imprint of a "star sole". There were two sets of tracks leading around the northern end of the house near the chimney, one a large track with "star sole" and the other a smaller track with a smooth sole. The evidence also shows that one set of tracks led away from the house following a path going east in the direction of the defendant's home and at a certain embankment, there was a clear imprint of the boot or shoe with the star sole and further up on the path was blue mud, some mud of like character and color being on the shoes worn by the defendant on Saturday, September 4th, Saturday night and the next day. These shoes were taken from defendant's house by the sheriff and his posse after the body was found with other articles.

The Rowland place was in Lamar County west or northwest of defendant's home.

While deceased and defendant were in Fayette on Saturday before the killing, the evidence shows that the deceased cashed a check at the Fayette Bank and received from the bank $420 in new $20 bills, which were subsequently found by the sheriff and his deputies in a steel chest on defendant's porch about ten thirty or eleven o'clock on Sunday night September 5th. The chest was a steel tool chest and was kept locked. The evidence further shows that the deceased borrowed from one Roberson while in Fayette $300 in $20 bills and there was a bill fold with $300 in it found in said chest on defendant's back porch. The bills constituting the $420 found in the chest were identified by an agent of the Federal Reserve Bank of Birmingham and the Bank of Fayette as the identical money that was paid to the defendant on said check cashed in Fayette on Saturday. These bill folds in said tool chest were covered up with carpenter's tools. Also found in the tool chest was a box of 38 caliber cartridges from which some of the cartridges had been taken loaded with lubaloy bullets with bronz tips and the evidence goes to show that the bullet taken from the head of the deceased was of the same type as the bullets in these cartridges. The presence of these cartridges in the tool chest was not accounted for. The defendant and his witnesses all testified that the defendant had not owned a gun or pistol in eighteen or nineteen years. The evidence further goes to show that when defendant was asked by the sheriff that night if he had had a money transaction with the deceased on Saturday, he stated that he had had no money transaction with the deceased. After the money was found in the tool chest, however, defendant first said there was $720 in the tool chest, but subsequently changed his statement and said there was $920 in said tool chest. In a later statement to the officers the defendant testified that the deceased owed him $500 and that he had paid that debt to him on Saturday on the court house steps in Fayette and so testified on the trial. He

also testified that he returned to his home at about ten o'clock. Defendant further testified that at about eight-thirty or nine o'clock the deceased came to his house in his car, that he had two Negroes in the car with him and said they were drunk or drinking and he was afraid and asked defendant to go with him to take them home. That he did not see the Negroes but heard them talking and that he refused to go because he was having an attack of asthma.

When the officers came to defendant's house on Sunday night, they found the shoes which the defendant, after a proper predicate, admitted he had worn on Saturday night and Sunday, being combat boots which one of his sons had given him. The evidence further shows that the clothes which he was wearing on Saturday and Saturday night were wet. The sheriff took these articles as evidence and also the sheets and pillow cases off the bed where defendant had been resting and, which, according to some of the testimony appeared to have blood stains or blood spots or splotches on them. These were sent off for examination by the Federal Bureau of Investigation and the report showed that the spots or splotches were not sufficient from which a positive test that the spots or splotches were blood could be made.

The defendant denied the killing and gave evidence tending to show an alibi which was corroborated, except for the time between about nine and eleven o'clock on Saturday night. During all that time and during Saturday there had been a heavy rain in and around the defendant's place and the place where the body was found. The tracks found under the well shed and on the path leading from the Rowland place toward defendant's house were compared with the shoes worn by the defendant and the evidence goes to show that said tracks were made by said shoes.

The defendant and his wife testified that about a week before they had gone to the Rowland place to hunt for pears for preserving purposes; that defendant went in the house and was under said well shed and had on the shoes offered in evidence.

The testimony of the defendant further tended to show that the money which was found in the tool chest was $500 paid to him by deceased and the other was accumulated from the sale of chickens and eggs and that deceased left $200 with him "in trust" on Saturday night. This developed in defendant's testimony for the first time on the trial. Although defendant, his sons and wife testified that for twenty years or more he had been an asthmatic invalid, he also testified as to the wetness of his clothes and shoes, that he went to the pasture in the rain to drive up his stock on Saturday evening.

The evidence offered in rebuttal by the state goes to show that defendant made contradictory statements of his testimony given on the trial as to the money found in the chest and defendant's statements in respect thereto.

The two major contentions of appellant are: (1) That the testimony given by the deceased's wife as to the statements made by the deceased to her as he was preparing to start on the journey from their house to the house of defendant, admitted over his objections, were illegal, hearsay testimony erroneously received in evidence over defendant's protests and were highly prejudicial and deprived the defendant of a fair trial. (2) That the solicitor and his associates were so strenuous in their prosecution, verging on vindictiveness before the court and jurors, that their conduct in the presence of the jury was prejudicial to the defendant's rights and prevented him from receiving a fair trial. And the appellant argues that by the method of presenting the state's evidence, the solicitor failed to show at just what period of time the deceased came to his death and hence there were two or three hours that the defendant could not show his whereabouts, except by his own testimony.

We now proceed to deal with these questions in the order stated. We readily concede that cases can be found in some other jurisdictions that would sustain appellant's contention, but they are not in accord with the settled law in Alabama and the weight

448

of authority in other jurisdictions. From the annotations found in 113 A.L.R. p. 273, we take the following statement of the rule:

■ "Evidence of the statements of a person since deceased with reference to the purpose or destination of a trip or journey, no matter how short, that he was about to make, has been admitted as competent in a considerable number of actions, both civil and criminal in character. See the following cases: (citing Mutual [Life] Ins. Co. v. Hillmon, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706, and decisions from other federal courts together with cases from Alabama and many other states)."

The rule was stated in Alabama by this court as early as 1844, speaking through Collier, C. J.: "It was said in West v. Price's Heirs, 2 J.J.Marsh [Ky.], 380, that 'conversations or declarations made by the actor or party concerned, at the time an act is done, and which explain the *quo animo* and design of the performance, may, whenever the nature of the act is called in question, be given in evidence as part of the *res gestae*. Without tolerating this explanation of the acts of men, by receiving their accompanying declarations, we should be often misled as to their true nature and character, and consequently liable to fall into errors in respect to them. The rule requiring *res gestae* declarations to be received as evidence, is a necessary and very useful one.' (Citing authorities).

"In the case before us, the thing done was the departure of the plaintiff from his home; what he said upon leaving, or immediately previous thereto, as to the point of his destination, the object he had in view and when he expected to return, were explanatory of his intention; and in the absence of opposing proof, might repel the imputation that he was absconding or otherwise endeavoring to evade the service of ordinary process. These declarations, it is true, would not be conclusive upon the defendant; but it would be competent for him to prove that they were not just exponents of the *res gestae*. Other evidence would be admissible to show that his acts and intentions were different from

what his statements indicated. The testimony on this point, it will follow, was improperly rejected." Pitts v. Burroughs, 6 Ala. 733.

This rule of evidence has been repeatedly reaffirmed by our courts. Kilgore v. Stanley, 90 Ala. 523, 8 So. 130; Martin v. State, 77 Ala. 1; Harris v. State, 96 Ala. 24, 11 So. 255; Burton v. State, 115 Ala. 1, 22 So. 585; Central of Georgia R. Co. v. Bell, 187 Ala. 541, 65 So. 835; Roberson v. State, 218 Ala. 442, 118 So. 654; Rogers v. State, 16 Ala.App. 58, 75 So. 264; Hall v. State, 26 Ala.App. 344, 159 So. 500.

The *res gestae* alluded to here is not the *res gestae* of the main fact—the murder, but the res gestae of the act being performed or immediately contemplated by the declarant, the act of beginning or contemplating the trip or journey. Maddox v. State, 159 Ala. 53, 48 So. 689; Mayo v. State, 15 Ala. 304, 73 So. 141; Hardaman v. State, 17 Ala.App. 49, 50, 81 So. 449.

■ The ruling of the court in receiving the testimony of the witness Mrs. Taylor was consistent with the rule and free from error.

■ In the light of the record before us, while it appears that the solicitor was diligent, aggressive and earnest in presenting the case, he was courteous to his adversaries, to the court and to the parties, and we see nothing in his conduct of the case that could have prejudiced the jury or offend the rights of the defendant. He was within his rights in representing the state. The case was skillfully tried both for the state and the defendant and the court in the oral charge and in the fifty-odd written charges given at the instance of the defendant gave him the benefit of every applicable rule of law. After a painstaking examination of the record, we are firmly of the opinion that the evidence presented a case for jury decision.

The refused charges were in effect the affirmative charge on different phases of the case or were argumentative and were refused without error.

After full consideration we are unable to affirm that the verdict of the jury is against the great weight of the evidence.

The court, therefore, did not err in overruling defendant's motion for a new trial. No error appearing on the record, the judgment of the circuit court is affirmed.

Affirmed.

FOSTER, LAWSON, and STAKELY, JJ., concur