[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1051 
Appellant was convicted of murder in the first degree of Beverly Stockard, the wife of appellant.
The evidence presented by the State was lengthy, consisting of testimony of several witnesses that, when taken together, established almost conclusively that the victim was killed by a bullet from a pistol about eight or nine o'clock on the night of August 26, 1978, while defendant and the victim were sitting in the cab of defendant's pickup truck while the truck was at a trailer park at Curry, Walker County, Alabama. Testimony presented by defendant was relatively brief, consisting merely of the testimony of defendant himself.
Details of the lengthy evidence without any material bearing on the issues presented on appeal need not be stated. We endeavor to summarize the evidence in material respects.
According to the undisputed evidence, both defendant and his wife were highly intoxicated at the time of the fatal incident, and for a long time before. During the day they together had consumed between forty and fifty cans of beer at a ratio between him and her of about four to three. A short time before she was killed, they were both trying to get some more beer to drink.
The defendant and the victim had been married about three years. He was between thirty-four and thirty-seven years old, and she was forty-four. Her daughter and her daughter's children were living at one of the mobile homes or trailers of the trailer park where Beverly Stockard was killed. The victim's daughter had been married, but she was divorced. Defendant and his wife arrived at the trailer park about 6:00 P.M. While there, considerable argument, fussing and quarrelsome conduct ensued between the two. Defendant was complaining that his wife had left him once before, and that she was attempting to do so at that time. According to the witnesses for the State, including the victim's daughter, he made threats that he would kill his wife, and manifested threatening conduct by getting out of the truck with a pistol in his hand and brandishing it. Around eight o'clock defendant and his wife left the particular trailer park in his truck but returned in a short time, which was estimated by some of the witnesses at ten minutes. About the time the truck came to a stop, there was a pistol shot within the driver's compartment of the truck. Those that heard it or saw the fire from the pistol were startled but apparently did not know with certainty what had occurred until afterwards. According to the defendant's testimony, he did not fire the pistol, but he noticed immediately that his wife was badly hurt, and he proceeded forthwith to drive her to the hospital, where she was pronounced dead.
Defendant took the position on the trial that (1) Mrs. Stockard had committed suicide or (2) that defendant was too intoxicated to be guilty of murder, or both (1) and (2).
As to (1), there is little contention on appeal. It is sufficient, we think, to state that under all the circumstances, particularly unequivocal testimony of definite threats by defendant to kill her with the pistol that killed her, a jury question on that issue was presented. *Page 1052 
As to (2), appellant strongly urges that the undisputed evidence shows that defendant was so intoxicated that he could not have had the specific intent essential to murder in either degree, or premeditation and deliberation essential to murder in the first degree. There is little, if any, disagreement between the parties as to the principle of law involved. There has been uniform acceptance of the statement:
 "Voluntary drunkenness neither excuses nor palliates crime. But in murder cases evidence of drunkenness to such degree that the accused is incapable of rational action and hence incapable of performing a specific intent essential to a malicious killing may reduce the killing to manslaughter, or may negative the premeditation and deliberation essential to murder in the first degree, or reduce the crime to murder in the second degree. Ivory v. State, 237 Ala. 344, 186 So. 460; King v. State, 90 Ala. 612, 616, 8 So. 856." Helms v. State, 254 Ala. 14, 19-20, 47 So.2d 276, 281
(1950)
In accord with Helms and cases cited therein are Gautney v.State, 284 Ala. 82, 222 So.2d 175 (1969); Green v. State, Ala.Cr.App., 342 So.2d 419 (1977); Jones v. State, Ala.Cr.App.,362 So.2d 1303 (1978).
Although the facts as to the means and method by which the victim was killed in Helms are considerably different from such facts in the instant case, the evidence as to a long period of drinking and the extent of the intoxication of both defendant and the victim in that specific uxoricide is markedly similar to the evidence in this case. It was there held that it was within the province of the jury to decide, as it did, that defendant was not so intoxicated as to be incapable of committing murder in the first degree. Such is our conclusion in this case. Incredible as it may be that the two could have drunk as much beer as they did without being "dead drunk," the undisputed evidence is that they were not that drunk. The undisputed evidence to the effect that the mind of defendant was clear enough for him to conduct himself as he did, moving here and there in his truck without positive objection by his wife, or by any of his other acquaintances at the trailer court, and that he instantly perceived after his wife was shot that he should drive her to the hospital, which he successfully did, at a rate of speed of between forty and seventy miles an hour, furnishes substantial, if not unquestionable, support for a finding by the jury that he was not so intoxicated that he did not have the mental ability to commit murder in the first degree.
During an extensive cross-examination of defendant, the following occurred:
 "Q. In fact, you drove that truck by yourself, didn't you?
"A. Yes, sir, I did.
"Q. Were you drunk at that time?
"A. Pretty well drunk.
 "Q. So, you were really driving while intoxicated weren't you?
"A. Yes, sir.
 "Q. You were on the highways of this county endangering the lives of innocent people while you were drunk is that right?
"A. Yes, sir.
 "MR. TWEEDY: This is certainly immaterial. It is prejudicial. Put in there deliberately by the District Attorney in this case to try to prejudice this defendant with the jury. I ask the Court to instruct the jury not to consider that.
 "COURT: Ladies and Gentlemen of the jury, disregard the last statement of the District Attorney.
 "MR. TWEEDY: Also, I would like to ask the Court to instruct the District Attorney not to use such matters that he knows are prejudicial and not competent evidence in this case and if he continues to do it I will ask the Court to enter a mistrial in this case.
"COURT: I deny that request.
"MR. TWEEDY: We except."
Appellant now urges that the court erred in failing to grant a mistrial by reason of the questions asked as quoted above. It must be noted that defendant did not ask for a mistrial at the time. Whether he would was conditioned upon the future conduct of *Page 1053 
the District Attorney. Although the question asked was after a declarative sentence of the questioner, which was argumentative, any prejudice to defendant was not of an ineradicable nature and did not warrant a mistrial.
Appellant complains by reason of the testimony of defendant's mother to the effect that after the shot that killed Mrs. Beverly Stockard, defendant came by his mother's house before going to the hospital, which appellant says constituted an effort to impeach defendant on an immaterial matter, defendant having theretofore testified that he made no stops along the way in taking his wife to the hospital. We find no objection to the testimony of which appellant now complains. Furthermore, the particular evidence, although introduced by the State in rebuttal, was not offered in impeachment of defendant's testimony but in "mere contradiction" thereof. See Lusk v.State, 129 Ala. 1, 30 So. 33 (1900); Bell v. State, 124 Ala. 94,27 So. 414 (1899); Gamble, McElroy's Alabama Evidence, § 176.01 (8) (1977).
Another assertion of error is based upon the court's overruling defendant's objection to a portion of the argument to the jury by counsel for the State as now quoted:
 "Let's talk about another matter at this time. They talk about Mrs. Stockard that the state had to call as a witness. I didn't enjoy doing that. I wish I didn't have to call the mother to the witness stand to testify. I didn't enjoy that.
 "MR. JACKSON, Judge, I enter an objection to that comment on who we call and who we don't call. Let it reflect back to the objection that was made as to the evidence commented on about us calling fingerprints and everything like that. It is improper argument and illegal argument and we enter objection as to calling Mrs. Stockard and checking fingerprints.
"COURT: Overruled.
"MR. JACKSON: We except."
Appellant argues that the State was allowed to argue that they had to call "the defendant's own mother to the witness stand to make the defendant out a liar." We agree that the words "had to call" in the argument for the prosecution could conceivably have carried with them the implication that the State had to call her as a witness because defendant did not do so, but it is clear that counsel for the State intended no such implication and that a more reasonable construction of the words in their context is that the asserted involuntariness in calling the witness was by reason of the natural disinclination to ask a mother to testify against her son. We do not doubt the sincerity of any imputation of ingeniousness, instead of ingenuousness, to be found in the language used by counsel for the State, but we are convinced he meant what he said and nothing more.
In combining his objection to the particular argument with an objection to previous argument of State's counsel relative to lack of evidence as to fingerprints or the like on the pistol involved, we note that it seems that defendant's counsel opened the door to any argument by the State as to the absence from the evidence of evidence of fingerprints. All the arguments of counsel are in the record. We note therefrom that in the State's opening argument no reference was made to the matter of fingerprints on the gun. Thereafter, in the two arguments of counsel for defendant, there was considerable reference to the question of fingerprints on the gun, in which they were making the strong point that the State, by promptly having fingerprints lifted from the gun, comparing them with fingerprints of defendant and the victim and presenting evidence to the jury as to the results of such procedure, could have aided the jury on the pivotal question of who fired the gun. To some of such argument there was objection by the State, which generally was overruled by the trial court. At the conclusion of the last argument of defendant's counsel, he summarized to some extent his point by saying:
 "I thank you for your kind attention and thank you for time and again, I'm sorry Charles [District Attorney Baker] got mad. I apologize to him because I did *Page 1054 
not mean to leave the impression that he would do anything wrong. I'm just saying down the line they took the fingerprints off the gun and they could have been compared and they weren't compared.
"Thank you."
The first paragraph of the concluding argument of counsel for the State, the objection thereto of counsel for defendant, and the ruling of the court are shown by the following:
 "Any fingerprint that is in the custody of the state toxicologist is available to the defense. We have to disclose every piece of evidence that has ever been taken to the defense. If we don't we can't try the man. They have come before you and tried to cloud the issue. Don't you know as competent an attorney as Mr. Tweedy and Mr. Jackson is, as great an attorney as Mr. Tweedy, known throughout the state of Alabama, do you think they would let something like that slip by.
 "MR. JACKSON: I object to that on grounds, Judge, that we filed a motion to produce in this case and were never offered a fingerprint card that was in the toxicologist's office.
"COURT: Overruled.
 "MR. BAKER: It was available to them and they knew about them."
The concluding argument of counsel for the State continued to the end without any objection by defendant in which there was any reference to fingerprints, other than in the objection hereinabove quoted in which appellant included the matter of fingerprints in the objection to the argument of State's counsel as to its calling defendant's mother as a witness. The argument of counsel for the State was in reply to argument by defendant and did not violate the principle that a party may not comment on his opponent's failure to produce certain evidence that is equally available to the party making the comment.
The following portion of the record, which occurred during the direct examination by the State of the victim's daughter, is made the basis of another assertion by appellant that there was prejudicial error on the trial:
"Q. Were you drinking that day?
"A. No, sir.
"Q. Night?
 "A. No, sir. I sure wasn't. She [Mrs. Stockard] came in and that is when she said if anything happened to her to tell the police who she was with and I told her nothing was going to happen to her. . . .
 "MR. TWEEDY: I move to exclude that. That is not something in the presence and hearing of the defendant.
"COURT: Granted.
 "MR. TWEEDY: I ask the Court to instruct the jury to disregard . . .
 "COURT: Jury disregard the last statement of the witness."
The record continues as follows:
 "A. Anyway I told her nothing would happen and I talked her into going back out to the truck and when she got out there Herbert asked her if she was going with him or going to stay and she told him that she was going to stay to give her her purse. He said, `Well, you can stay if you want to but you know what is going to happen if you do.' She said, `Well I will just go with you, then.'
"Q. Where was the truck parked during this time?
 "A. It was parked right in front of my step-grandmother's trailer."
Appellant says that the injury caused defendant by the testimony of the witness, which was excluded by the court as noted above, was not, and could not have been, eradicated by the action of the court. We think it was highly prejudicial, but we do not say that it was so highly prejudicial that it could not have been made harmless. Furthermore, there was no motion by defendant for a mistrial, and the occurrence did not justify a mistrial in the absence of a motion therefor. Notwithstanding this view, we are of the opinion that there was a sequel, in two parts, to the particular incident that eventually resulted in prejudicial error, which we now discuss. *Page 1055 
The first part of the sequel was in defendant's cross-examination of the witness:
 "Q. You said you talked Bev into going back with him that night?
"A. She . . .
 "Q. I believe you told the District Attorney a while ago that . . .
 "A. She told me she was afraid he was going to hurt her and we had been talking that day and . . .
 "Q. All right. What I'm asking is you said she told you she thought Herbert was going to hurt her and you told her to go on back with Herbert, didn't you?
 "A. Yes, I told her to go ahead that he probably wouldn't hurt her.
 "MR. BAKER: I would like to bring it to the Court's attention that this is hearsay testimony that we haven't been allowed to go into heretofore and since this comes from defense counsel the state intends now to explore that on redirect.
 "MR. TWEEDY: Your Honor, this was brought out by the State and she testified on direct examination and the State brought this out that she talked Bev into going back with him on that night. She so testified on direct examination when Mr. Baker asked her.
 "MR. BAKER: I just want to point that to the Court on redirect.
 "MR. TWEEDY: I point out to the Court also that I did not go into this myself, first. He started into the matter himself.
 "Q. Now, when you told her to go on back with him did you call the law?
"A. No, sir. She went to the truck . . .
"Q. I'm just asking . . . Did you call the law?
"A. No, sir.
 "Q. Did you make any effort to get anybody up that way to stop them?
"A. No, sir."
The second part of the sequel is found in the interstices of seven pages of the record during the testimony of the same witness on redirect examination, which we attempt to abridge as follows:
 "Q. About how long did you all stay in the trailer there?
"A. About five minutes.
 "Q. About five minutes. What if anything else did your mother say to you in that conversation?
 "MR. TWEEDY: Wait just a minute. I want to object to that. It is incompetent, irrelevant, immaterial and hearsay.
 "COURT: This conversation, I believe, has already been opened.
 "MR. TWEEDY: The evidence was brought in by the State on direct examination and I have the right to cross on that. I did not introduce this in evidence. The State introduced it in evidence. I can go back on my notes and the court reporter can go back if you would like to hear it.
 "MR. BAKER: Court has not allowed us to go into conversation that she had with her mother in the trailer. Defense counsel has gone into that conversation and we have the right to explore that and show everything that was said.
 "COURT: Ladies and Gentlemen of the jury, I am going to ask that you go in the jury room A until we decide this point of law.
 "THE FOLLOWING TAKES PLACE OUT OF THE PRESENCE AND HEARING OF THE JURY:
 "COURT: As I recall this conversation between the witness and her mother it was first brought out by the defense. [There were then comments by counsel as to who first brought out the conversation between the witness and her mother and then the case proceeded in the presence and hearing of the jury]
"COURT: I overrule your objection.
 "MR. TWEEDY: We except. What I'm objecting to is him further going into conversation because he brought it out on direct examination to start with.
 "Q. (Mr. Baker) Shirley, let me direct your attention now to the conversation that you had in Polly Darty's trailer when just you and your mother were present.
 "COURT: O.K. Mr. Tweedy, I'm going to give you a standing objection to this entire line of questioning as to the conversation. *Page 1056 
". . . .
 "Q. Did she say anything else to you in the trailer there?
"A. Yes, sir.
 "MR. TWEEDY: I object to that. It is not a part of the same conversation I asked about. If it was brought out it was brought out by the State on direct examination. It is improper examination and it is hearsay evidence, not in the presence and hearing of the defendant.
 "COURT: Standing objection. Overruled. Standing exception.
"Q. Did she say anything else to you?
 "A. She started crying. She hugged my neck and told me if anything happened to her to be sure and tell the police who she left with. I told her I would. I said, `Why don't you just go back and get in the truck to keep from causing trouble.' I said, `Maybe he won't hurt you.' She said, `Well, just remember what I said.' I said, `I will. If anything happens to you, I will.' She wanted to keep sitting in there talking to me and I was afraid Herbert would come and get her and
. . . . .
"MR. TWEEDY: I object to that.
 "COURT: Sustained. Jury disregard the last statement of the witness.
"Q. Did she say anything else to you, Shirley.
 "A. No, sir. I just told her to go back to the truck."
We are convinced that the trial court, in its commendable effort to obtain the correct answer to the profusely argued question as to which party first injected evidence as to a conversation between the victim's daughter and the victim, quite understandably came to an incorrect conclusion to the effect that it was first injected by defendant's counsel. It seems to us that it was first injected by the irresponsive answer of the witness to a question asked her on direct examination by the State. For this, neither the defendant nor his counsel was responsible.
In addition, we are not persuaded that even if, under all the circumstances, defendant's attorney had first asked the witness some question pertaining to a conversation between her and her mother, out of the presence of defendant, such action would have opened the door to the introduction by the State of everything said by the victim during such conversation. The testimony of the witness as to what the mother said to her would on its face have been hearsay, but some of that which was said, or that could have been said by the mother, could have well been under one or more of the many exceptions to the hearsay rule of exclusion. The admissibility in evidence of anything said by the victim that came within any exception to the hearsay rule of exclusion, where shown by one party, would not entitle the other party to introduce evidence of what the victim said, out of the presence of the defendant, that would not come within an exception to the hearsay rule.
The most damaging part of the testimony of the witness as to what her mother told her was that part of her answer quoted above, in which she said, "She hugged my neck and told me if anything happened to her to be sure and tell the police who she left with." Neither that statement nor substantially the same statement of the victim as shown in the testimony of the witness for the first time on the subject, which was excluded from the consideration of the jury on motion of defendant, falls within any exception to the hearsay rule. We do not agree with the position taken by appellee, that "It was part of theres gestae, or part of the events leading up to the killing." In support of its position it cites Martin v. State, 77 Ala. 1
(1884) and Harris v. State, 96 Ala. 24, 11 So. 255 (1892). In each case, the trial court was upheld for admitting in evidence the statement of the victim of an alleged homicide as he was leaving on his last journey before he was killed. A similar conclusion was reached in Thornton v. State, 253 Ala. 444,45 So.2d 298 (1950) holding that the statement was admissible as a part of the "res gestae of the act being performed or immediately contemplated by the declarant, the act of *Page 1057 
beginning or contemplating the trip or journey." Before proceeding further, we should invite attention to the confusion that has been noted by use of the term "res gestae" in designating an exception to the rule against hearsay. IllinoisCentral R.R. v. Lowery, 184 Ala. 443, 63 So. 952 (1913); 6 Wigmore, Evidence, § 1745 (Chadbourn rev. 1976); Gamble,McElroy's Alabama Evidence, § 265.01 (1) (1977).
In 6 Wigmore, Evidence, § 1726 (Chadbourn rev. 1976), the author comes close to the question whether in this case the victim's statement at the time she was last seen alive by her daughter was admissible evidence of her "design or plan":
 "(1) Where on a charge of murder the defendant seeks to prove that the deceased killed himself or that a third person killed him, this hypothesis is of course properly open to proof. Yet, as a matter of precaution, courts usually require something more than a single piece of evidence; they will not admit, for example, the mere fact that the deceased was melancholy, or that a third person fled the country. But, assuming that the data as to suicide or a third person's guilt are sufficient to be considered, and that the deceased's plan of suicide, or the third person's plan of killing, is one item herein, then the declaration of the deceased or the third person are a proper mode, under the present exception, approving the plan. To this no objection seems to have been raised for a third person's threats, but in a few rulings the deceased's declarations of intention to commit suicide have been excluded.
 "These rulings are entirely without foundation in principle."
In the most injurious part of the testimony of the witness as to what the victim told her, i.e., "[I]f anything happened to her to be sure and tell the police who she left with," we find nothing therein tending to show her own plan or design, unless perhaps the plan or design that negatived the plan or design not to take her own life. However, in the testimony, we find that there is strong evidence of her own feeling that she was in danger of losing her life at the hands of defendant. Even so, that feeling on her part was not an item of admissible evidence, and would not have been admissible, as tending to show that defendant killed her. Whether it would have been admissible for the purpose of tending to show that she did not commit suicide, which question neither party on appeal has argued, we will not, and should not, attempt to say at this time for the reasons (1) that both parties should have the opportunity to express themselves fully on the point and (2) it is clear that the trial court ruled as it did solely on the ground that the defendant had opened the door for the admission in evidence of the statement. Whether it would rule in favor of the State, under all the circumstances that would be presented to it on the question of its admissibility, in the absence of an opening of the door for it by the defendant, we do not know; whether it should so rule is first a question for it to decide, before an appellate court is asked to rule whether, in the light of any discretion vested in the trial court on the point, its action would constitute reversible error. Thus we must conclude at this time that there was error to the injury of defendant in admitting, over the objection of defendant, the especially injurious part of the victim's statement to the witness.
In its oral charge to the jury, the court said:
 "If any witness testifying has been impeached, then the jury may disregard his testimony, unless his testimony is corroborated by other testimony not so impeached."
At the conclusion of the oral charge and promptly after the court asked if there were any exceptions to it, the following occurred:
 "MR. BAKER: I would like for the Court to define to the jury venire the meaning of the term impeachment of testimony.
 "COURT: I believe they understand that. I have no straight legal definition. I think that it is clear.
 "MR. TWEEDY: I want to except to that. `If witness testifying is impeached you may disregard the testimony.' *Page 1058 
"COURT: What specifically?
"MR. TWEEDY: Just that part.
 "COURT: If any witness testifying has been impeached, then the jury may disregard his testimony, unless his testimony is corroborated by other testimony not so impeached.
"MR. TWEEDY: O.K. That's what I want."
The quoted portion of the court's oral charge to which defendant excepted has been upheld as a correct and proper instruction to the jury in several cases. Most of them are cited in Judge Price's treatment of a similar charge[1] requested by defendant and refused in Richardson v. State, 43 Ala. App. 412, 191 So.2d 251, 254 (1966):
 "Refused Charge 8 has been held good when it refers to a specified witness. Sanderson v. State, 28 Ala. App. 216, 181 So. 506, a witness, Davis v. State, 2 Ala. App. 200, 56 So. 844, Any witness, Churchwell v. State, 117 Ala. 124, 23 So. 72. A witness for the state, Creel v. State, 23 Ala. App. 241, 124 So. 507. The charge here is confusing. It refers to the witness. Several witnesses testified on the trial. The charge was also properly refused because it is abstract. There was no evidence tending to impeach any witness. Densmore v. State, 25 Ala. App. 133, 141 So. 914. If, as contended by defendant, the two arresting officers contradicted each other on important and material points, this would not amount to impeachment. `A mere contradiction of one witness by another is not an impeachment of the witness so contradicted.' Walters v. State, 19 Ala. App. 92, 95 So. 207."
The quotation from Richardson, supra, suggests the advisability of a careful study of the facts and circumstances in each of the cases cited upholding charges similar to the one under consideration, and shows that there could be facts and circumstances in a case that would make the giving of the charge inappropriate. It was expressly held therein that the charge in the particular case was both confusing and abstract, which justified its refusal.
We are faced with the question whether the giving of the charge constitutes error in a particular case, that is, whether it constitutes error under the facts and circumstances of the instant case.
As heretofore indicated, all of the witnesses in the case, except the defendant, were called to testify by the State. In making known his exception to the charge, no reasonable conclusion can be reached other than that the defendant deemed it to be applicable to his own testimony, and perhaps to his own testimony alone. After defendant's testimony and when defendant rested, the State called one witness, one witness only, in rebuttal. She was the mother of defendant who, as previously indicated, testified to some extent in contradiction of defendant's testimony, to the effect that defendant came by her house on the way from the place his wife was shot to the hospital. Unfortunately, both parties seem to take the position that this evidence by defendant's mother constituted an impeachment of him. Semantics is involved, for as stated inRichardson, supra, contradiction by one witness of other witness is not an impeachment of the other witness. In the argument of defendant's counsel and in the closing argument of State's counsel, the particular testimony introduced in rebuttal by the State is referred to as impeachment or impeaching testimony. In the concluding argument of State's counsel, we find:
 "He went over two miles out of his way over to his mother's house. I'll tell you what. His own mother has made him not speak the truth to you. His own mother has impeached his testimony."
In the field of evidence, as elsewhere, "impeach" or "impeachment" can have more than one meaning, and sometimes a variety of meanings. Especially should there be a distinction between successful impeachment and unsuccessful impeachment, *Page 1059 
a distinction between evidence of incredibility and establishment of incredibility, a differentiation between some evidence that a witness is unworthy of belief and undisputed evidence that he is unworthy of belief. To ignore such distinction is to lead to unjust results.
Careful consideration of the several methods of impeaching a witness leads to the reasonable conclusion that not every one of them would establish that the witness is unworthy of belief. For instance, although a witness may be impeached by showing a statement made by him that is contradictory of his testimony in a particular case, this in and of itself would not justify a rejection of all of his testimony, as plausible and as credible as his testimony otherwise appears.
We conclude that whenever and wherever it has been said and held that the impeachment of a witness, standing alone, has the effect of entitling a jury to disregard the testimony of the witness, it is correctly applicable only to a situation where the witness has been so impeached as to be shown to be unworthy of belief.
It is worthy of observation, we think, that in criminal cases the question of the propriety of an instruction to the jury such as the one under consideration has arisen chiefly as to the refusal of written charges requested by defendant. As the burden of proving the defendant's guilt is upon the state, and without proof of defendant's guilt he cannot be convicted, it can be readily seen that if proof of his guilt is dependent entirely upon the testimony of a witness who has been shown to be unworthy of belief, the jury should be caused to understand that they may disregard the testimony of such witness and find the defendant not guilty. Non sequitur, however, that in every case, a jury may properly be so instructed as to be caused to understand that the emphatic testimony of a defendant, the only witness for the defense and the only living eyewitness to the alleged crime, may be disregarded, even though the evidence shows him to be a witness unworthy of belief. In the first situation, a conviction is dependent upon the truth of the testimony of the particular witness; in the latter, an acquittal is not necessarily dependent upon the testimony of the particular defendant; it could be based solely upon the impotence or weakness of the testimony for the state. To add to the charge the proviso, "Unless his testimony is corroborated by other testimony not so impeached," is to impinge upon the principle of the burden of proof and the presumption of innocence, and is to compound the confusion and exacerbate the injury to defendant that could be expected to result from the giving of such a charge under the circumstances of the instant case.
The fact that counsel for the State, at his first opportunity, requested clarification of the particular instruction by saying, "I would like for the Court to define to the jury venire the meaning of the term impeachment of testimony," emphasizes the importance of a clear understanding by the jury of what the court meant by "impeachment" of a witness in charging the jury on the subject. The court erred to the injury of defendant in giving the particular instruction in its oral charge, to which defendant specifically and sufficiently excepted.
Although defendant may have been greatly discredited as a witness in the minds of the jury in the strong cross-examination of him by counsel for the State, particularly as to incidents in the matrimonial life of defendant and the victim, which indicated gross mistreatment of his wife by him, nothing in his testimony, or any of the testimony of any other witness, constituted any of the recognized definite methods of impeaching a witness. None is claimed, as indicated above, other than the conflict between his testimony and the testimony of his mother. Assuming that he was not telling the truth as to the point, this would not in and of itself authorize the jury to disregard his testimony as a whole, particularly as to who fired the pistol that killed his wife. To hold otherwise would be in conflict with the established principle that false testimony of a witness, in and of *Page 1060 
itself, will not justify the rejection by the jury of the testimony of the witness unless it is wilfully false. Patton v.State, 156 Ala. 23, 46 So. 862 (1908); Sanders v. Scarvey,284 Ala. 215, 224 So.2d 247 (1969); Palmer v. Rucker, 289 Ala. 496,268 So.2d 773 (1972).
 "In the oral charge the court also stated in regard to the impeachment of a witness, that, if the jury believed that any witness had testified falsely as to some material fact, they may at their discretion disregard the remainder of his testimony. The opinion of the Court of Appeals concedes that this oral instruction incorrectly stated the rule of law in that respect. In Montgomery v. State, 17 Ala. App. 469, 86 So. 132, reviewed by this court in Montgomery v. State, 204 Ala. 389, 85 So. 785, it was pointed out that before a jury is authorized to disregard the testimony upon the principle of falsus in uno, falsus in omnibus, it must appear that the testimony so given was wilfully false, and that it related to material matters. Numerous authorities are cited, both from the Court of Appeals and from this court, and the statement is so well understood as to call for no further citation in that regard." Pinkerton v. State, 246 Ala. 540, 541, 22 So.2d 113, 114.
Appellant insists that the trial court was in error in admitting in evidence, over objections of defendant, testimony as to the details of prior difficulties between the deceased and the accused. Several instances in the cross-examination of defendant are made the basis of this insistence. To decide either way and show our reasons therefor would unduly extend this opinion in its already unusual length. By reason of the necessity for a reversal on the grounds already stated and the possibility or likelihood that the cross-examination of defendant in another trial will not follow in detail the cross-examination on the trial under review, we forego for the time being a determination of the particular issue.
For the reasons above stated, the judgment of the trial court should be reversed and the cause remanded.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
REVERSED AND REMANDED.
All the Judges concur, except DeCARLO, J., who dissents.
[1] "[I]f the witness has been impeached, his entire testimony may be disregarded, unless corroborated by the testimony not so impeached."