[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1124 
Earl A. Bryars, Jr., was indicted and tried for the shotgun slayings of Lemmie Maynard Coleman and Dave Hudson, two murders which constituted a capital felony in violation of § 13A-5-31 (a)(10), Code of Alabama 1975, because they occurred during a single event. The jury found the appellant guilty as charged and, pursuant to § 13A-5-31 (a), Code of Alabama 1975, fixed his punishment at death. The trial court conducted a separate sentencing hearing, in which it determined that the aggravating circumstances outweighed the mitigating circumstances. As a result, the trial court sentenced the appellant to death by electrocution. See Appendix A, hereto attached and made a part hereof.
Appellant's subsequent motion for a new trial was duly denied.
On appeal, Ala., 407 So.2d 566, we originally reversed and remanded this cause for a new trial on the authority of Beck v.Alabama, 447 U.S. 625, 100 S.Ct. 2382, *Page 1125 65 L.Ed.2d 392 (1980).[1] On certiorari the United States Supreme Court vacated our decision and remanded this cause to us for further consideration in light of Hopper v. Evans, 456 U.S. 605,102 S.Ct. 2049, 72 L.Ed.2d 367 (1982). Alabama v. Bryars,457 U.S. 1114, 102 S.Ct. 2921, 73 L.Ed.2d 1326 (1982). For the reasons set forth below we now affirm appellant's conviction for the capital felony charged in the indictment, and his death sentence.
On November 21, 1979, between 5:30 and 7:00 p.m. Maynard Coleman and Dave Hudson were killed at Coleman's farm in Escambia County, Alabama. Their bodies were discovered shortly after 7:00 p.m. by Mrs. Coleman and Maynard's sister and her husband, Dr. and Mrs. Charles Nolan. The Nolans had arrived that afternoon for a visit with the Colemans. When Maynard did not return from the farm as expected, they drove to the farm to look for him. With the aid of a flashlight they found his body where he had fallen after being shot in the back with a slug from a 12-gauge shotgun. Maynard had fallen flat on his stomach and his cigar was still in place between his fingers. Upon further investigation after the authorities arrived, the body of Dave Hudson was found where he had been shotgunned to death approximately 28 feet from Maynard. Unlike Maynard, Hudson had been shot with "buckshot." Part of one round of buckshot had hit Hudson in the arm and another round had practically blown his face away. Both men were dead at the scene.
The physical evidence indicated that Maynard and Hudson had been killed by a single gunman. The killer fired one 12-gauge slug which struck Maynard in the back, apparently killing him instantly, ejected a second slug which misfired, and then fired three rounds of "buckshot" at Hudson, one of which left a full pattern on the wall of the nearby barn. The four empty 12-gauge shells and the misfired 12-gauge slug were recovered at the scene. Subsequent evaluations of these shells by firearms experts revealed that they were fired from a 12-gauge shotgun that appellant's wife had purchased for him just four days before the murders.
Ronnie Coleman, Maynard Coleman's 14-year-old cousin, was the key witness for the prosecution. He testified that while hunting in the woods near Maynard's barn between 5:15 and 5:30 p.m. on the day of the murders, he saw the appellant's truck parked in the edge of the woods where it had been "backed in." Later, while he was talking to Erskin Packard outside his trailer, he heard four shotgun blasts from the vicinity of Maynard's barn. Two or three minutes later the appellant, heading in a direction away from Maynard's barn, drove by in his truck. The appellant did not stop to talk, as he usually did, and did not even wave as he drove past Ronnie and Erskin Packard.
Erskin Packard confirmed the fact that there were four shotgun blasts and that several minutes later he saw the appellant's truck go by. However, he did not see who was driving.
Sheriff G.S. Byrne testified that he went to interview the appellant, as a possible suspect, the morning after the murders. The appellant was very cooperative, and in fact, at the sheriff's request, gave him his 12-gauge shotgun for comparison with the 12-gauge shells found at the scene of the crime. The appellant retrieved the shotgun from his truck, unloaded it, and handed it to Sheriff Byrne. This shotgun was later conclusively proven to be the murder weapon.
Mrs. Coleman, Maynard's wife, testified that her husband began carrying a shotgun and a pistol in his truck after an October 12, 1979, incident with the appellant. The appellant and Maynard had had an argument at Thadius Johnson's home concerning *Page 1126 
some land in which they shared undivided interests. Thadius Johnson testified that his wife asked the appellant to leave so that there would not be a fight. Junior Coleman, Maynard's "double" first cousin testified that, because of this incident, Maynard had given him some sort of an agreement concerning the land and had asked Junior to deliver it to the appellant because Maynard did not want to confront the appellant. Aubrey Weaver, Jr., stated that Maynard told him the appellant had told others he (the appellant) was going to "take care of" Maynard. Finally, William V. Williams testified that on the day he was killed, Maynard Coleman told him that he was meeting the appellant later that day to resolve their differences concerning their joint property.
Appellant's defense was alibi. He and his wife both testified that he was elsewhere when the murders were committed. According to them, the appellant and Jasper Brown, appellant's hired hand, spent the majority of the day burning brush on appellant's property. They finished working at 4:30 p.m., returned to appellant's home and ate supper. The appellant took Brown home at 4:45 p.m. and returned by 5:15 p.m. Appellant's wife then drove the appellant and their children, in her car, to Atmore, where she did some shopping. The appellant remained in the automobile while his wife did the shopping. They returned home at 6:30 p.m. and the appellant did not leave the house again that night.
Jasper Brown, testifying for the appellant, stated on cross-examination that they left appellant's house at about 5:15 p.m., and that the appellant drove and bought a newspaper at a nearby store before he dropped off Brown, near Brown's home, at 5:30 p.m. The appellant left Brown and headed in the direction of Maynard's barn, where the murders were committed.
The appellant confirmed the detour for the paper, but stated that Brown was incorrect about the time. He admitted driving toward Maynard's barn but stated that he was going to visit Junior Coleman to borrow a "bush-hog." After finding no one at home at Junior's trailer, he returned home and accompanied his wife to Atmore.
Neither the appellant nor his wife could recall anyone they saw on the shopping expedition that might have seen them. They presented no other evidence to corroborate their trip.
The appellant denied that he had had any arguments with Maynard Coleman over their joint property and denied that he had had a meeting scheduled with Maynard for that afternoon. He surmised that Ronnie Coleman had lied about seeing his truck parked in the woods near Maynard's barn at about 5:30 p.m. When confronted with his testimony at a bond hearing to the effect that he had taken Brown home at 5:30 p.m., he stated that he was confused at the bond hearing, and that the truth was that he took Brown home between 4:30 and 4:45 p.m.
The appellant, specifically, denied shooting Maynard Coleman and Dave Hudson.
The conflicting evidence was put to the jury which resolved the issues against the appellant and returned a verdict of "guilty as charged," fixing punishment, as required by statute, at death by electrocution.
At the separate sentencing hearing evidence of aggravating and mitigating circumstances was reviewed by the trial court. Several of appellant's employers and friends testified as to his good work habits and good character. A presentence report revealed that the appellant had two misdemeanor convictions for disorderly conduct. As a result of evidence presented at the sentencing hearing the trial court found as the only mitigating circumstance that the 52-year-old appellant did not have a "significant history of prior criminal activity." The only aggravating circumstance he considered was that the crime was especially heinous, atrocious, and cruel. In the trial court's opinion the mitigating circumstance was insufficient to outweigh the aggravating circumstance. The trial court, therefore, sentenced the appellant to death by electrocution. *Page 1127 
 I
The appellant was indicted, tried and convicted in accordance with the provisions of §§ 13A-5-30 through 38, Code of Alabama 1975, the Alabama Death Penalty Act then in effect. A clause in § 13A-5-31 (a), Code of Alabama 1975, which precluded trial courts from instructing capital offense juries on possible lesser included offenses, was, subsequently, ruled unconstitutional by the United States Supreme Court in Beck v. Alabama, 447 U.S. 625,100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).[2] This clause was, eventually, severed from § 13A-5-31 (a) and the remainder of Alabama's Death Penalty Act left intact. Beck v. State,396 So.2d 645 (Ala. 1980). A later United States Supreme Court decision explained that a case tried when the preclusion clause was in effect did not, necessarily, have to be re-tried. Hopper v.Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982). "The jury must be permitted to consider a verdict of guilt of a non-capital offense" only when "the evidence would have supportedsuch a verdict." (Additional emphasis supplied.) Hopper v. Evans, supra.
The appellant contends that he should be granted a new trial either because the evidence presented at trial supports a non-capital felony murder conviction or because he should be given the opportunity to present additional evidence of possible lesser included offenses, an opportunity he did not have when the preclusion clause was part of the Death Penalty Act. We disagree.
Appellant's arguments have, essentially, been answered in Cookv. State, 431 So.2d 1322 (Ala. 1983). In Cook Justice Adams spelled out the Hopper v. Evans two prong test of the effect of the preclusion clause on a trial as follows:
 "(1) Was there any evidence presented at trial upon which a conviction of a lesser included offense could have been based?
 "(2) If not, has the defendant suggested any plausible claim which he might conceivably have made, had there been no preclusion clause, that is not contradicted by his own testimony at trial?"
He further concluded that negative answers to each of these questions would require an affirmance of the trial conviction.
As in Cook, the appellant in the case before us presented only
an alibi defense. All of the state's evidence, though circumstantial, supported the "double-murder" capital felony charged in the indictment. So the answer to the first prong, as in Cook, is that the evidence presented would not have supported a conviction for a lesser included offense.
But the appellant argues that without the preclusion clause he might have been able to present evidence that the homicides were not murders because they were not intentional or premeditated or because they were the result of "heat of passion," surprise, inadvertance, accident, or even self-defense. This argument is foreclosed in Cook, however, where the Alabama Supreme Court stated that "when a defendant takes the witness stand and testifies that, because he was in a distant location when the crime took place, he could not possibly have committed it [as the appellant did in the instant case], he has directly contradicted any evidence which he might later produce to show that he was guilty of a lesser included offense."
Consequently, the answer to both prongs of the Hopper v. Evans
test is no, and the appellant is not entitled to a new trial. The appellant was simply not prejudiced by the preclusion clause.
 II
The appellant argues that he was unconstitutionally sentenced because he did *Page 1128 
not have a bifurcated trial before the jury. This argument was foreclosed in Ritter v. State, 429 So.2d 928 (Ala. 1983), in which the Alabama Supreme Court held that there was nothing constitutionally infirm in the pre-Beck[3] sentencing procedure, which did not provide for bifurcation. The court reasoned that "[u]nder Alabama's statute the trial court and not the jury is the sentencing authority."
"[T]he jury's determination of a sentence is merely advisory, leaving sentence to the trial court for determination in a separate hearing." Ritter v. State, supra. The court found inRitter that the separate sentencing hearing, in which the trial court considered and weighed the aggravating and mitigating circumstances, "afforded [Ritter] a constitutional sentencing procedure which was in nowise tainted by arbitrariness or capriciousness."
Thus, the absence of a bifurcated trial before the jury is not grounds for reversal of appellant's pre-Beck trial.[4]
 III
The state presented, as proof of appellant's motive for killing Maynard Coleman, evidence that the two men were involved in a continuing dispute over some land in which they held joint interests. The details of the dispute were not clarified at trial. However, the state was permitted to introduce, through the testimony of several witnesses, evidence of general hostility and ill will between the two men due to this dispute, and evidence of a specific conflict which occurred at a mutual friend's home, several weeks before Maynard was killed. Some of the state's evidence on this issue was hearsay, statements made by the victim, Maynard Coleman, as testified to by several of the state's witnesses. The appellant contends that all of the hearsay evidence was inadmissible and that cumulatively, it was unduly prejudicial to him and was, therefore, reversible error.
The first evidence of prior difficulties between the appellant and Maynard Coleman came from Sheriff Byrne. On cross-examination the appellant brought out information concerning a specific incident which occurred at the home of Thadius Johnson, appellant's neighbor. Sheriff Byrne stated that he had first heard about this incident at the scene of the crime shortly after it had been committed, and that he discussed it with the appellant on the morning after the crime. The appellant read from his diary that the incident had occurred three weeks before, and he accompanied the Sheriff to Johnson's home to ask Johnson about the details of the incident. According to Sheriff Byrne, Johnson stated that there was not much to it. From what Johnson observed, the appellant discussed something with Maynard Coleman for a few minutes and knocked Maynard's hat to the back of his head and then left.
Thadius Johnson was, subsequently, called as a witness for the state. He confirmed the incident which occurred at his home on a Sunday afternoon in October, 1979. He was working on Maynard Coleman's truck. Maynard had been there three or four hours when the appellant arrived. Johnson was working on the other side of the truck from Maynard and saw the appellant go over and engage Maynard in conversation. Johnson did not pay much attention to, and did not hear, what they were discussing. After a few minutes he heard somebody "stomping the ground" and saw that the appellant had knocked Maynard's hat to the back of his head. *Page 1129 
Johnson then witnessed his wife tell the appellant to go home because she did not want any "squabbling" around there. The appellant left after telling Maynard "I'll see you later." Johnson testified that he was not particularly alarmed by the incident because the appellant was intoxicated at the time, and because he did not witness any real hostility between the two men.
Shelby Jean Coleman, Maynard's wife, testified that Maynard started carrying a shotgun in his truck after the incident at Thadius Johnson's home. She stated that Maynard told her that he had had an argument with the appellant. He did not tell her what the argument was about because she already knew that it involved friction between the two men over the land that they held jointly. She explained that she had first hand knowledge of the original agreement between Maynard and the appellant because she witnessed the negotiations. She was aware of subsequent disagreements over the final payment for the land and the ultimate division of the land between the two men. She identified a new written agreement that Maynard had drafted before his death. She did not actually see the agreement until after Maynard's death, when it was found among his personal effects. The details of the new agreement were not discussed but the agreement, itself, was admitted into evidence.
On cross-examination Mrs. Coleman admitted that she did not witness the incident at Johnson's home.
Junior Coleman testified that three weeks before Maynard was killed, just after the incident at Johnson's home, Maynard asked him to deliver the new written agreement to the appellant because the appellant "wanted to get rowdy" everytime they met. Junior never had an opportunity to deliver the agreement, so he gave it back to Maynard.
The trial court did not err in admitting into evidence the foregoing proof of appellant's motive for killing Maynard Coleman. Motive was a proper inquiry in this case. See, Bowman v.State, 35 Ala. App. 420, 47 So.2d 657 (1950); Balentine v. State,339 So.2d 1063 (Ala.Cr.App.), cert. denied, 339 So.2d 1070 (Ala. 1976); Dolvin v. State, 391 So.2d 666 (Ala.Cr.App. 1979), affirmed, 391 So.2d 677 (1980). The incident at Johnson's home was evidence of a prior difficulty or hostility between the appellant and the victim, Maynard Coleman, and was relevant evidence of a motive for the crime. White v. State, 380 So.2d 348
(Ala.Cr.App. 1980), and cases cited therein.
The appellant, through his cross-examination of Sheriff Byrne, first inquired into the details of this prior incident, thereby, opening the door to the state for the introduction of evidence of the entire transaction. See, Gibson v. State, 91 Ala. 64,9 So. 171 (1891); Stockard v. State, 391 So.2d 1060 (Ala. 1980), reversing, 391 So.2d 1049 (Ala.Cr.App. 1979). The Sheriff's testimony was later verified by Johnson, an eyewitness to the incident, and by the appellant, himself. There was, clearly, no dispute that the appellant and Maynard had a discussion that day at Johnson's home.
The appellant maintains that it was a friendly discussion and that he flipped Maynard's hat in fun and jokingly told him he would see him later. He admitted at trial, however, that Mrs. Johnson did ask him to go home because she did not want a fight around her house.
Johnson, though he testified that he did not think there was a serious problem, admitted that a confrontation had taken place, and he related to the jury his wife's statement to the appellant, language which clearly indicated that she felt there had been a heated argument and there might be a forthcoming fight. Johnson's testimony as to what his wife told the appellant was hearsay, but it was admissible. The statement was made "in the presence and hearing" of the appellant and was more or less confirmed by the appellant at trial. See, Garrett v. State, 76 Ala. 18, 21 (1884);Beachum v. State, 346 So.2d 531 (Ala.Cr.App. 1977).
The damaging part of Mrs. Coleman's testimony was her observation that *Page 1130 
Maynard began carrying a shotgun in his truck after the incident. Her observation was not hearsay. It was, however, a strong indication of the growing hostility between Maynard and the appellant, and was, therefore, admissible. See, Padgett v. State,49 Ala. App. 130, 269 So.2d 147, cert. denied, 289 Ala. 749,269 So.2d 154 (1972); Hill v. State, 51 Ala. App. 515, 286 So.2d 924
(1973); McClendon v. State, 54 Ala. App. 327, 307 So.2d 723
(1975); White v. State, supra.
Junior Coleman's testimony that Maynard gave him the agreement to give to the appellant was also a relevant indication of the hostility that existed between the two men at the time of the incident at Johnson's home. (Cases cited above.)
Mrs. Coleman's testimony that Maynard told her he had had an argument with the appellant at Johnson's home, and Junior Coleman's explanation of why Maynard had given him the written agreement to deliver to the appellant, though hearsay, were not prejudicial to the appellant because they were merely cumulative references to the incident at Johnson's home. Love v. State,377 So.2d 8 (Ala.Cr.App. 1979); Wyatt v. State, 419 So.2d 277
(Ala.Cr.App. 1982).
William V. Williams testified that, on the afternoon he was killed, Maynard told him that he was going to meet the appellant to try to reach an agreement about the land that he (Maynard) and the appellant held together. This hearsay testimony was admissible as part of the res gestae of the meeting Maynard had planned for that afternoon, the meeting which resulted in his death. See, Harris v. State, 96 Ala. 24, 11 So. 255 (1892);Thornton v. State, 253 Ala. 444, 45 So.2d 298 (1950); Hayes v.State, 395 So.2d 127 (Ala.Cr.App. 1980), cert. denied,395 So.2d 150 (Ala. 1981).
In addition to the above, Aubrey Weaver testified that Maynard told him about his disagreement with the appellant and that the appellant had "put the word out" that he, the appellant, was going to "take care of him." Weaver's testimony was inadmissible hearsay. Its admission into evidence was error. It did not relate to or reference the prior incident at Johnson's home, but rather related to the jury the victim's (Maynard's) statement about a prior threat made by the appellant. Even though it was relevant to show motive, such evidence should have been excluded because it was a hearsay statement by the murder victim which was not made in the presence of the appellant and was not admissible as part of the res gestae or as a dying declaration. Holland v.State, 162 Ala. 5, 50 So. 215 (1909); Kitchens v. State, 251 Ala. 344, 37 So.2d 428 (1948); Hill v. State, 339 So.2d 1077
(Ala.Cr.App.), cert. denied, 339 So.2d 1082 (Ala. 1976); Harrisv. State, 395 So.2d 1063 (Ala.Cr.App. 1980), cert. denied,395 So.2d 1069 (Ala. 1981).
However, a possible motive for the crime had already been presented by other legal evidence, as noted herein. Thus, such evidence was cumulative on the issue of motive. Furthermore, all of the circumstances pointed to the appellant as the killer. Maynard Coleman and Dave Hudson were killed at Maynard's barn with a 12-gauge shotgun. One of appellant's own witnesses saw the appellant driving his truck in the direction of Maynard's barn just minutes before the two men were killed. The appellant's truck was seen later where it had been concealed in the edge of the woods near Maynard's barn. Shortly, thereafter, two witnesses heard four shotgun blasts from the direction of Maynard's barn and almost immediately afterwards saw the appellant leaving the vicinity in his truck. The next morning appellant's newly purchased 12-gauge shotgun, which was eventually identified as the murder weapon, was recovered from his truck, the same truck he drove from the vicinity of the crime just after it was committed. Under these circumstances we find that the erroneous admission of Weaver's testimony was harmless. A.R.A.P. 45; Whitev. State, supra; See also, Whisenhant v. State, [Ms. 82-333, July 8, 1983] (Ala. 1983), on remand, [Ms. 1 Div. 333, August 30, *Page 1131 
1983] (Ala.Cr.App. 1983), and cases cited therein.
 IV
The appellant makes several arguments with reference the murder weapon, appellant's 12-gauge shotgun, and the shotgun shells fired from it during the crime. These arguments are without merit.
The shotgun was not improperly seized. The appellant voluntarily turned it over to Sheriff Byrne, during the Sheriff's initial interview with him at appellant's home the morning after the crime. The appellant was a possible suspect, but had not been arrested at that time. Under the circumstances, Miranda warnings were not required.
There was no break in the chain of custody of the shotgun shells.
There was nothing improper in requiring appellant's firearms expert to examine the shotgun and the shotgun shells in Alabama. Appellant's expert did examine these items at the Mobile, Alabama, Department of Forensic Sciences Laboratory. There was no evidence that the facilities afforded appellant's expert were in any way inadequate.
 V
Appellant's arguments concerning the introduction of gruesome photographs, appellant's cross-examination of state's witnesses, and the state's compliance with the trial court's order to produce certain items of evidence, have been carefully reviewed but are without merit.
 VI
The appellant further contends that certain of the trial court's instructions to the jury were inadequate or erroneous.
 A
Although the trial court instructed the jurors that if they failed to agree upon a verdict of guilt or innocence, a mistrial would be declared, he refused to instruct them as to the consequences of a mistrial, as requested by the appellant. The appellant argues that this refusal was error, especially in light of the fact that lesser included offense instructions were precluded. We disagree.
The appellant requested the additional instructions that after a mistrial he could be tried again for the aggravated offense or for a lesser offense. The appellant suggests that this additional instruction would have given the jury a "third option" in addition to either "guilty and death" or "not guilty and set free," and would have somewhat compensated for the absence of lesser included offense instructions. Appellant's theory is that if the jury had realized that appellant was guilty of a non-capital offense and deserved some punishment other than death, it could have exercised this "third option" to avoid both the death penalty and an acquittal.
We believe that appellant's theory is faulty for the very reasons discussed in Beck v. Alabama, 447 U.S. 625, 644,100 S.Ct. 2382, 2393, 65 L.Ed.2d 392 (1980). In Beck v. Alabama the United States Supreme Court commented on the theory that a mistrial was a "third option" as follows:
 "We are not persuaded by the State's argument that the mistrial `option' is an adequate substitute for proper instructions on lesser included offenses. It is extremely doubtful that juries will understand the full implications of a mistrial or will have any confidence that their choice of the mistrial option will ultimately lead to the right result. Thus, they could have no assurance that a second trial would end in the conviction of the defendant on a lesser included offense. Moreover, invoking the mistrial option in a case in which the jury agrees that the defendant is guilty of some offense, though not the offense charged, would require the jurors to violate their oaths to acquit in a proper case — contrary to the State's assertions that juries should not be expected to make such lawless choices. Finally, the fact that lesser included offense instructions have traditionally *Page 1132 
been given in non-capital cases despite the availability of the mistrial `option' indicates that such instructions provide a necessary additional measure of protection for the defendant [when justified by the evidence]." (Footnote omitted).
The trial court, in this instance, purposely avoided the additional mistrial instructions so that the jurors would not be distracted from their duty to determine appellant's guilt or innocence of the capital offense charged in the indictment. He adequately instructed them on the elements of the offense charged and on the "reasonable doubt" standard that governed their ultimate determination. Because his defense was alibi (and the state had sufficiently proven the elements of the offense charged), the appellant was either guilty of the capital offense, or guilty of nothing. The trial court properly focused the jury's attention on this crucial determination.
 B
The appellant also complains that the trial court erred in explaining to the jury that if it returned a verdict of guilty and fixed punishment at death, the trial court would ultimately determine, after a proper sentencing hearing covering aggravating and mitigating circumstances, whether the appellant received the death penalty or, instead, a sentence of life imprisonment without parole.
This instruction by the trial court in no way harmed the appellant, because the trial court exhaustively instructed the jury on its paramount duty to weigh the evidence and determine appellant's guilt or innocence, and thereby, focused the jury's attention where it belonged. Compare, Crowe v. State,435 So.2d 1371 (Ala.Cr.App. 1983); and McGinnis v. State, 443 So.2d 1289
(Ala.Cr.App. 1983), and cases cited therein.
 VII
As the only aggravating circumstance, the trial court found as follows:
 "The Capital Felony in this cause was especially heinous, atrocious or cruel.
 "The basis for said finding in this cause is that the evidence in this cause for the State clearly established that the Defendant threatened to get the deceased, Lemmie Coleman [Maynard], over a business deal, and proceeded to arm himself on November 17, 1979, with a deadly weapon and on November 21, 1979, traveled to the scene of this crime; crept up on the said Lemmie Coleman and executed this victim while the said victim was working in a barn on the victim's own farm by shooting the said Lemmie Coleman from ambush in the back. The evidence in this cause further indicates that at the time the Defendant assassinated Lemmie Coleman an elderly colored farm hand named Dave Hudson was on the scene of this crime and when this old gentleman attempted to flee for his life the Defendant deliberately shot him to the ground, and proceeded to blow his brains out even though there was absolutely no evidence of any dispute on the trial of this cause between the said Dave Hudson and the Defendant. The evidence presented on the trial of this cause further indicates that three shots were fired at this innocent elderly farm hand by the Defendant and that this old gentleman was first wounded in the arm before the Defendant executed the coup de grace to this victim by firing a shell from a 12-gauge shotgun into the head of this innocent and helpless bystander.
 "It is the opinion of this Court that such shocking and depraved action on the part of this Defendant meets in every respect the definition of heinous, atrocious or cruel as used in the Death Penalty Statute defining aggravating circumstances by the standard encompassing acts which are totally and senselessly bereft of any regard for human life. It is further the opinion of this Court that such a callous act on the part of the Defendant in this cause meets in every respect the definition of "atrocious", as meaning outrageously wicked and vile as used in State Statutes setting forth aggravating circumstances *Page 1133 
authorizing the Death Penalty."
This determination by the trial court is supported by the evidence, which revealed circumstances comparable to those inBush v. State, 431 So.2d 555 (Ala.Cr.App. 1982), affirmed,431 So.2d 563 (Ala. 1983), wherein we stated as follows:
 "Execution-type slayings evincing a cold, calculated design to kill, fall into the category of heinous, atrocious or cruel. [Citations omitted]. We recognize that an instantaneous death caused by gunfire is not ordinarily a heinous killing. [Citation omitted]. However, when a defendant deliberately shoots a victim in the head in a calculated fashion to avoid later identification, after the victim has already been rendered helpless by gunshots to the chest, such `extremely wicked or shockingly evil' actions may be characterized as especially heinous, atrocious, or cruel." [Citation omitted.]
In addition to affirming the trial court's finding that this capital offense was especially heinous, atrocious, and cruel, we also note the existence of the additional aggravating circumstance (apparently not considered by the trial court), that "two or more human beings [were] intentionally killed by the defendant by one or a series of acts" (the aggravation specified in the definition of the capital offense, itself.)See, Kyzer v. State, 399 So.2d 330, 338 (Ala. 1981) (reversed on authority of Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382,65 L.Ed.2d 392 supra); See also, Dobard v. State,435 So.2d 1338 (Ala.Cr.App. 1982), affirmed, 435 So.2d 1351 (Ala. 1983);Colley v. State, 436 So.2d 11 (Ala.Cr.App. 1983).
 VIII
Appellant's argument concerning the admissibility of his pre-sentence report during the sentencing hearing is without merit. Contrary to his argument on appeal, he did challenge, during the sentencing hearing, certain hearsay statements made by the father of one of the victims and had the opportunity to elaborate on his objection at that time. The trial court later ordered that the entire report be included as part of the record on appeal, apparently, considering and overruling appellant's objections to the alleged hearsay. We are at a disadvantage on appeal, because, in spite of the trial court's order, the report was not made a part of the record and is not now before us. Nevertheless, it is obvious that any hearsay statements contained in the report were not prejudicial to the appellant. As a result of the sentencing hearing and the pre-sentence report, the trial court found, as a mitigating circumstance, that the appellant had no significant history of prior criminal activity. The only aggravating circumstance found was that the crime was especially heinous, atrocious, and cruel. As demonstrated in its findings of fact, the trial court did not base this aggravating circumstance determination on anything contained in the pre-sentence report, but rather based it upon the evidence produced during the guilt-phase hearing. Consequently, the pre-sentence report, if anything, was beneficial to the appellant in establishing the only mitigating circumstance.
 IX
The appellant and his counsel diligently brought to our attention numerous arguments for the reversal of this cause. In addition, we have searched the record for any other reversible errors. We have found no errors which adversely affected the substantial rights of the appellant.
The trial court's findings with reference the aggravating and mitigating circumstances were supported by the evidence.[5]
After independently weighing the aggravating and mitigating circumstances, ruling out the possibility of passion, prejudice and other arbitrary factors, and comparing the nature and circumstances of this crime and the character and record of the appellant with similar cases, we have concluded that the sentence of death is indeed appropriate for this appellant. *Page 1134 
Appellant's conviction and sentence of death are, hereby, affirmed.
AFFIRMED.
All the Judges concur.
[1] In Beck the United States Supreme Court found unconstitutional that portion of Alabama's death penalty statute which precluded
consideration of lesser included offenses. On the authority ofBeck cases were reversed and remanded for new trials in which lesser included offenses could be considered. Hopper v. Evans
further explained that new trials were mandated only where there was evidence of possible lesser included offenses.
[2] The preclusion clause outlawed in Beck v. Alabama had already been transferred, verbatim, from § 13-11-2 (a), Code of Alabama 1975 (the applicable code section in Beck v. Alabama) to § 13A-5-31 (a), the corresponding provision of Alabama's New Criminal Code. Our comments herein are addressed to the provisions of the New Criminal Code, which is applicable herein, but they are based upon the prior analysis of corresponding provisions in the former death penalty act (§§ 13-11-1 through 9, Code of Alabama 1975).
[3] Beck v. State, 396 So.2d 645 (Ala. 1980).
[4] We make no attempt to reconcile the conclusion in Ritter with the statement in Beck v. State, 396 So.2d 645, 660, that:
 "We [the Alabama Supreme Court], therefore, construe the requirement in § 13-11-2 (a), that the jury `shall fix the punishment at death' to be permissive and to mean that the jury cannot fix punishment at death until it takes into account the circumstances of the offense together with the character and propensity of the offender, under sentencing procedures which will minimize the risk of an arbitrary and capricious imposition of the death penalty."
We are bound by the conclusion in Ritter, which is the latest pronouncement by the Alabama Supreme Court.
[5] See Appendix A, hereto attached and made a part hereof.
 APPENDIX A STATE OF ALABAMA, PLAINTIFF, VS. EARL A. BRYARS, JR., DEFENDANT. IN THE CIRCUIT COURT OF ESCAMBIA COUNTY, ALABAMA CRIMINAL DIVISION CASE NO. CC-80-29 SENTENCE
This cause coming on to be heard on the 17th day of June, 1980, to hear evidence and argument from the State as to aggravating circumstances which it feels are the basis for upholding the Jury's Verdict of Death, and also evidence and argument from the Defendant as to mitigating circumstances which the Defendant feels should serve as a basis to reject the Jury's Verdict of Punishment by Death, the Court, after careful consideration of the testimony taken on the 17th day of June, 1980, and during the trial in chief of this cause from Monday, May 12, 1980, through Friday, May 16, 1980, finds the following aggravating circumstance to exist:
 ONE
The Capital Felony in this cause was especially heinous, atrocious or cruel.
The basis for said finding in this cause is that the evidence in this cause for the State clearly established that the Defendant threatened to get the deceased, Lemmie Coleman, over a business deal, and proceeded to arm himself on November 17, 1979, with a deadly weapon and on November 21, 1979, traveled to the scene of this crime; crept up on the said Lemmie Coleman and executed this victim while the said victim was working in a barn on the victim's own farm by shooting the said Lemmie Coleman from ambush in the back. The evidence in this cause further indicates that at the time the Defendant assassinated Lemmie Coleman an elderly colored farm hand named Dave Hudson was on the scene of this crime and when this old gentleman attempted to flee for his life the Defendant deliberately shot him to the ground, and proceeded to blow his brains out even though there was absolutely no evidence of any dispute on the trial of this cause between the said Dave Hudson and the Defendant. The evidence presented on the trial of this cause further indicates that three shots were fired at this innocent elderly farm hand by the Defendant and that this old gentleman was first wounded in the arm before the Defendant executed the coup de grace to this victim by firing a shell from a 12-gauge shotgun into the head of this innocent and helpless bystander.
It is the opinion of this Court that such shocking and depraved action on the part of this Defendant meets in every respect the definition of heinous, atrocious or cruel as used in the Death Penalty Statute defining aggravating circumstances by the standard encompassing acts which are totally and senselessly bereft of any regard for human life. It is further the opinion of this Court that such a callous act on the part of the Defendant in this cause meets in every respect the definition of "atrocious", as meaning outrageously wicked and vile as used in State Statutes setting forth aggravating circumstances authorizing the Death Penalty.
Counsel for the Defendant has called the attention of this Court to the very recent case of Robert Franklin Godfrey vs.State of Georgia decided by the Supreme Court of the United States on May 19, 1980, as negating the imposition of the Death Penalty under the circumstances established in this cause. After study of the facts in the case cited by Defense Counsel and after comparing the Georgia Statute to the Alabama Statute, and taking into consideration the interpretation placed on the Georgia Statute by the Supreme Court of Georgia *Page 1135 
wherein this State Supreme Court held that under the Georgia Statute as worded the evidence must demonstrate torture, depravity of mind or an aggravated battery to the victim before death, this Court finds this contention unpersuasive and without merit. In short, a careful reading of the Godfrey case will disclose that in the majority opinion of the Supreme Court of the United States, the Georgia Supreme Court found itself hoisted with its own petard. In addition, in the case cited by Defense Counsel, the homicides described were the result of sudden passion growing out of a domestic dispute between husband and wife. In the case now before this Court, the evidence of the State clearly establishes a cold-blooded, carefully planned execution of two citizens of this State without provocation, sudden passion, just cause or good excuse. A careful reading of the Georgia Statute will further demonstrate a completely different wording than the verbiage utilized in the Alabama Capital Statute.
The United States Supreme Court has decreed that: "A capital sentencing scheme must provide a meaningful basis for distinguishing the few cases in which the Death Penalty is imposed from the many cases in which it is not." Section 13-11-2 of the 1975 Code of Alabama provides aggravated offenses for which the Death Penalty may be imposed. Sub-Section (10) of this Statute provides for the Death Penalty as decreed by the Jury in this cause in any case involving Murder in the First Degree wherein two or more human beings are intentionally killed by a Defendant by one or a series of acts, if such a Capital Felony was especially heinous, atrocious or cruel. In the opinion of this Court, the acts of the Defendant established by the evidence in this cause clearly established aggravating circumstances calling for the Death Penalty under the express wording of the Alabama Statute. The evidence in this cause portrayed to this Court a carefully planned, cold-blooded execution of two citizens of this State in such a manner as to be outrageously or wantonly wicked, criminal, vile or cruel as denounced by the Capital Death Statute of this State.
The Court finds the only mitigating circumstance which exists in this case is that the Defendant has no significant history of prior criminal activity. This Court finds this mitigating circumstance insufficient to outweigh the aggravating circumstance listed herein and, therefore, no basis to reject the Jury's Verdict of Death and impose a Life Sentence in Prison without Parole.
It is ORDERED that the independent pre-sentence investigation of the Defendant by the Probation Officer of Escambia County, Alabama, at the request of this Court, be made a part of the record in this cause over the objection of Counsel for the Defendant, said objection being made at the Mitigation and Aggravation Hearing held in this cause on June 17, 1980.
It is, therefore, ORDERED, ADJUDGED AND DECREED by this Court, after hearing all aggravating circumstances in this cause and after consideration of all mitigating circumstances presented by the Defendant, that you, Earl A. Bryars, Jr., are guilty of Capital Murder as charged in the indictment and that the Warden of the William C. Holman Unit of the Prison System at Atmore, Alabama, or in the case of his death, disability or absence, his Deputy, shall at any time before the hour of sunrise on October 3, 1980, inside the walls of said William C. Holman Unit at Atmore, Alabama, in a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution, cause to pass through your body, Earl A. Bryars, Jr., a current of electricity of such sufficiency to cause your death, and the application and continuance of such current through your body until you, Earl A. Bryars, Jr., be dead. And may God have mercy on your soul.
Execution of this sentence is herewith stayed pending appeal of this cause to the Appellate Courts of the State of Alabama, in accordance with Section 12-22-150 of the Code of Alabama, 1975, and Section 13-11-5 of the Code of Alabama, 1975. *Page 1136 
ORDERED at Brewton, Alabama, on this the 19th day of June, 1980.
 /s/ Douglas Webb
Circuit Judge