This is a "pre-Beck" death penalty case. Beck v. State,396 So.2d 645 (Ala. 1981). Bryars was convicted and sentenced to death for first degree murder of two persons intentionally killed in one or a series of acts. Section 13A-5-31 (a)(10), Code of Alabama 1975.
The victims, Maynard Coleman and Dave Hudson, were killed by shells fired from a 12 gauge shotgun on November 21, 1979, between 5:30 P.M. and 7:00 P.M. Investigators at the scene found four spent shells and one full slug which had apparently misfired.
There were no eye-witnesses to the shooting. Maynard's fourteen-year-old nephew, Ronnie, was in front of the trailer where he lived, talking to his mother's brother, Erskin Packard, when he heard four shots from the direction of Maynard's farm. Ronnie testified that he saw Bryars pass by in his truck two or three minutes after he heard the shots. Packard testified that he saw a blue automobile pass immediately after hearing the shots but did not see Bryars's truck pass by until about twenty minutes later.
Maynard's wife, sister, and brother-in-law found the bodies at about 7:00 P.M. that evening. They notified authorities, who secured the scene and gathered the shell casings.
The following morning the sheriff and an investigator went to Bryars's home to discuss the shootings with him. While the sheriff was talking to Bryars, other police cars arrived carrying sheriff's deputies and Atmore police officers. The sheriff asked Bryars if he owned a shotgun. Bryars replied that he did. The sheriff then stated: "Well, Earl, can I — could I get it and run some tests on it? You have been accused. Your name was brought up. I'd like to either clear you or if it falls the other way, it would fall the other way." Bryars replied, "Sure," and retrieved the gun and handed it to the sheriff.
After giving the shotgun to the sheriff, Bryars invited him into his house, where they discussed some land dealings Bryars had had with Coleman. Later, Bryars and the sheriff rode over to the home of an acquaintance of Bryars's and Coleman's, Thadius Johnson, to discuss an incident involving the suspect and the deceased at Johnson's home.
At the trial, an employee of the Department of Forensic Sciences testified that he fired several rounds through the shotgun in question and that, after comparing the test rounds to the shells found at the scene, he was of the opinion that the shells found at the scene had been fired through Bryars's gun. On cross-examination the expert testified that the breech faces, firing pin extractor, and ejector marks were all present and comparable. He admitted, however, that at the preliminary hearing he had testified that the weapon did not leave a usable breech mark. He admitted that he did not measure the depth of the firing pin mark or fire any other shotguns of the same make and model to compare with the shells.
Bryars's defense was alibi. His wife testified that he and Jasper Brown worked at the Bryars home until about 4:30 P.M. She testified that Bryars left to take Brown home about 4:45 P.M. and returned home around 5:15 P.M. She claims to have been with her husband the rest of the evening.
Jasper Brown testified that they worked until 4:30 P.M. to 5:00 P.M. and that he arrived home between 5:00 P.M. and 5:20 P.M. Brown testified that after letting him out, Bryars proceeded in the direction of Maynard's farm.
Bryars testified that he took Brown home about 5:00 P.M. He claimed that he went in the direction of the deceased's farm after letting Brown out in order to go to Junior Coleman's house to ask Junior if he could borrow a mowing machine. He testified that when he pulled up into Junior's driveway he saw that Junior's truck *Page 1138 
was gone, so he turned around and went home.
Bryars raised numerous issues in his petition. We will discuss only one of the issues raised, because the resolution of that issue is dispositive of the appeal.
The theory of the state's case was that Bryars and Maynard were embroiled in an ongoing dispute over some land and that as a result of their disagreement Bryars shot Maynard and an unfortunate bystander, Hudson. Testimony about the dispute centered around an incident at Thadius Johnson's home. Maynard had taken a truck to Johnson's for him to repair it. While Johnson was working on the truck Bryars arrived and engaged Maynard in a conversation. Johnson testified that he did not pay much attention to what was being said because he was concentrating on repairing the truck. He testified that he heard a sound like someone "stomping the ground" and the next thing he heard was his wife come out and tell Bryars to "go home" because she wasn't going to have any squabbling around there. Bryars replied, "Yes, ma'mam. I'll go home." He turned to Maynard and stated, "I'll see you later." Johnson testified that he was not alarmed by the incident and that he never observed any overt hostility between the two.
Bryars testified that his exchange with Maynard at Johnson's was not acrimonious. He denied ever having had any arguments or disagreements with Maynard.
In addition to allowing Johnson to give his account of what happened during the incident, the trial court, over the defendant's objections, allowed other witnesses to testify to statements they had heard the deceased make about the alleged dispute with Bryars. The victim's widow testified that as a result of the incident at Johnson's, her husband began carrying a shotgun. Aubry Weaver testified that Maynard had told him about the incident and that Bryars had "put the word out" that he was "going to take care of him." Junior Coleman testified that shortly after the incident the victim gave him a message to give to Bryars. The victim told Junior that he wanted him to deliver the message because every time he saw Bryars himself, Bryars tried to "get rowdy" with him. William V. Williams was allowed to testify that on the day of the shooting Maynard had told him that later in the day he planned to meet with Bryars to discuss the problem with the land.
The state argues that there is an exception to the hearsay rule with regard to statements made by the deceased which show the accused's motive. C. Gamble, McElroy's Alabama Evidence, §§ 45.01 (1) and 273.02 (3d ed. 1977).
Statements made by a homicide victim introduced for the purpose of showing the intent of the accused do not fall within an exception to the hearsay rule as such. Hearsay involves an out of court statement offered to prove the truth of the matter stated. In addition to the "classical" exceptions to the rule, e.g., admissions of a party opponent, declarations against interest, dying declarations, etc., utterences offered for some purpose other than to prove the truth of the out of court declaration fall outside the rule. Thus, in a homicide prosecution the accused may introduce evidence of communicated threats made by the victim to support a claim of self defense.Hunter v. State, 295 Ala. 180, 184, 325 So.2d 921, 925 (1975);Powell v. State, 52 Ala. 1 (1875). In a prosecution of D for the killing of X, if D's witness offered to testify that prior to the killing X stated, "D, I am going to kill you," the value of the testimony would not depend on the truth of the statement, viz., whether X actually intended to kill D, but the statement would be relevant in a claim of self defense to show the fear engendered in the defendant. Since the value of the statement would not depend on its truth, its admission would not violate the hearsay rule. See E. Cleary, McCormick'sHandbook on the Law of Evidence, (2d ed. 1972), § 249, at page 590. Indeed, McElroy's does not state that threats made by a homicide victim constitute an exception to the rule when offered to show the defendant's *Page 1139 
motive, but that such testimony would not violate the rule.
The statements by the homicide victim in this case were not offered to show the state of mind they engendered in the accused. The value of each statement depended, instead, on the truth of the matter asserted. Maynard's statement to his wife that he began carrying the shotgun because of the incident at Johnson's was offered to show why Maynard began carrying the shotgun. Likewise, statements reiterating threats made by Bryars toward Maynard fell within the rule. Statements by a homicide victim indicating ill will toward the victim by the accused are inadmissible unless the statements are made in the presence and hearing of the accused or fall within some other exception to the hearsay rule. Harris v. State, 395 So.2d 1063,1066 (Ala.Crim.App. 1980), cert. denied, 395 So.2d 1069 (Ala. 1981). Thus, it was error to allow a witness to testify that five minutes before he was shot the victim stated that the accused "was going after a gun and was coming back to kill him." Holland v. State, 162 Ala. 5, 11, 50 So. 215, 217-218
(1909).
The Court of Criminal Appeals, 455 So.2d 278, did not rely on a "motive" exception in ruling against the petitioner on appeal. It concluded that each witness's testimony was admissible on some other basis or that the admission of the testimony was harmless error. With regard to Mrs. Coleman's testimony that her husband began carrying a shotgun as a result of the incident at Johnson's, the court opined that the damaging aspect of the testimony was her observation of the shotgun, not her conclusion based on Maynard's statement that he began carrying it because of the dispute with Bryars. It ruled that the testimony by Junior Coleman that Maynard had given him something to give Bryars because every time he encountered Bryars he wanted to get "rowdy" with him was merely cumulative of the incident at Johnson's. It conceeded that testimony by Aubry Weaver that Maynard had told him that Bryars had "put the word out that he was going to take care of him" was inadmissible, but concluded that it was not reversible error because the testimony was "cumulative on the issue of motive." The court ruled that the testimony by Williams that Maynard told him that he intended to meet with Bryars that evening was within the res gestae of the offense.
We disagree with the conclusions of the Court of Criminal Appeals. The testimony relating statements made by the deceased was clearly inadmissible and in our opinion its admission into evidence constituted reversible error. The damaging aspect of Mrs. Coleman's testimony was not her observation of her husband carrying the shotgun. The damaging aspect of her testimony was her conclusion, based on Maynard's statements, that he began carrying the shotgun as a result of the incident. Similarly, Junior Coleman's testimony that Maynard told him that every time Bryars saw him he wanted to "get rowdy" with him was not merely cumulative of the evidence regarding the incident at Johnson's. Johnson's firsthand account of the incident, without more, would not support a conclusion that Bryars got rowdy with Maynard every time he saw him. Nor was the testimony that Maynard said Bryars was "out to get him" cumulative on the question of motive, except as to other inadmissible evidence. Viewed in its totality, there is simply no way to dismiss the inadmissible evidence of the incident at Johnson's as harmless or cumulative. The bulk of the state's testimony about the incident and about the alleged disagreement came not from eyewitness accounts but from hearsay statements.
The trial court also erred in allowing testimony by William V. Williams that Maynard had told him that he was going to meet with Bryars that evening. The last time Williams saw Maynard was at 1:45 P.M. on the day he was killed. Some time that day Maynard had made the statement to him at their place of employment in Pensacola, Florida. Maynard arrived home from work at 5:15 P.M. that day and changed clothes before leaving for the *Page 1140 
farm where he was killed. The statement to Williams could hardly be described as a declaration made by one setting out on a journey or immediately prior thereto. See Thornton v. State,253 Ala. 444, 448, 45 So.2d 298, 301 (1950); Harris v. State,96 Ala. 24, 29, 11 So. 255, 257 (1892). A statement made at a distant location some three and one-half hours prior to Maynard's leaving for the farm cannot be considered a statement made immediately prior to setting out on a journey.
The judgment of the Court of Criminal Appeals is hereby reversed and the case is remanded.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, JONES, ALMON, SHORES, EMBRY, BEATTY and ADAMS, JJ., concur.