502 So.2d 846 (1986)
Rozell EDWARDS
v.
STATE.
1 Div. 100.
Court of Criminal Appeals of Alabama.
November 25, 1986.
Rehearing Denied January 27, 1987.
*847 T. Jefferson Deen III, Mobile, for appellant.
Charles A. Graddick, Atty. Gen., and Beatrice Oliver, Asst. Atty. Gen., for appellee.
McMILLAN, Judge.
The appellant, Rozell Edwards, Jr., was convicted of the offense of attempted murder in violation of §§ 13A-6-2 and 13A-4-2 of the Code of Alabama (1975), and sentenced to 25 years in the State penitentiary.
Officer Kenneth Grissett, of the Mobile Police Department, testified that he answered a call to a Mobile residence and spoke with an unidentified man who was standing in the doorway of the house. He and another officer then noticed a trail of blood leading next door and, eventually, to the victim, King John Stanley, who was lying in the backyard of the next door neighbor's house. Officer Grissett also testified that the owner of that house stated that a man had come to the back door screaming for help.
Officer Wesley Sansing, of the Mobile Police Department, also answered the call; he testified that he also observed the "blood tracks" and that he entered the house. He testified that he observed neither blood nor signs of a struggle inside and, therefore, walked back outside and down the sidewalk, where he discovered a .12 gauge shotgun shell and a piece of tissue and a blood spot. He testified that, following the blood trail, he and Officer Grissett came upon the victim lying in the backyard of the house next door. Officer Grissett was recalled by the prosecution and testified as to statements made by the individuals who were in the house when the officers answered the call.
Charles N. Bailey, Jr., an identification officer with the Mobile Police Department, testified that he observed various blood trails, a spent .12 gauge, number 8 shotgun shell in the front of the residence, and a shotgun in a laundry room of the garage of the residence. He further testified that the barrel of the shotgun had been sawed off and that he was unable to lift any fingerprints.
The next door neighbor testified that on the night in question she heard a car horn blow and observed a brown car in the driveway of the house next door and saw a man exit the car and go into the house. She further testified that approximately 45 minutes later, she heard someone yell, "Help! Call the police." Thereupon, she went to her kitchen door and observed a man running toward her house. She identified the man as King John Stanley, the victim. She then heard a gunshot and saw a flash. She testified that she quickly shut her door and locked it, whereupon the victim began beating on her front door. She testified that her husband got up and asked her who was yelling for help. The victim then ran to the den door and began knocking on it, whereupon the victim telephoned the police. She testified that she then observed the victim leave the den door and go into the backyard, where he lay down under a bush. She also testified that she had seen the man and his car on several occasions in the past when he had been visiting the house next door.
The man who lived across the street testified that he heard a gunshot and then *848 someone yell for help. He further testified that he went to his front door and observed a flash of a gun and again heard the screams for help. He then called the police.
The victim, King John Stanley, testified that he works as a "spiritual advisor," which "is a person that people come to when they have different problems, and they want you to spiritually pray for them, in order for that problem to cease to be a problem." In that respect he stated that he sells candles, incense, oils, vitamins, facial stuff and shampoo. He testified that he had been a spiritual advisor to the appellant's wife and sold her between $1,500 and $2,000 worth of spiritual goods for which she had never paid. He further testified that she had revealed to him that she was going to file a lawsuit to obtain some insurance money from her ex-husband's death and that she would then have to get out of Mobile. She also told him that she had been cashing her sister-in-law's allotment checks and government checks mailed to her dead mother. The victim testified that the appellant's wife then told him that she and her daughter had conspired to kill her ex-husband and that she wanted the victim to testify in her behalf if charges were brought against her. She claimed that only through such testimony could the victim ever recover the money which she owed him. She also told him that a ring which she had sold him previously did not belong to her and that she needed it back; however, the victim had pawned the ring but agreed to accompany her to retrieve it. The victim testified that on the night in question, the appellant's wife called him and asked him to come get the money in order to retrieve the pawned ring. The victim then testified that he went to her house, whereupon she began making advances toward him, which he resisted. The victim testified that the appellant and his wife's brother kicked open the bedroom door; the appellant was holding a shotgun and asked what was going on. The victim testified that he was fully dressed and that the appellant stated, "I'm fixing to blow your damn head off." The victim began begging for his life when the appellant's wife allegedly stated, "He know [sic] too much of my business. Shoot him. Kill him." The appellant then ordered the victim to lie across the bed, whereupon he handed the shotgun to his wife's brother and attempted to tie the victim with some cable. However, the victim struggled vigorously and ran for the front door. The appellant grabbed the shotgun and shot the victim in the back. The victim further testified that the shot hurled him into the front door and he ran outside yelling for help. On redirect examination, the victim testified that the appellant's wife had recently been found guilty of murdering her ex-husband.

I.
The appellant contends that the trial court erred in allowing a witness to testify about statements made by a third party to the witness outside the presence of the defendant. Specifically, the appellant refers to two separate occasions at trial. The investigating officers testified as to what several individuals at the scene of the crime told them and the victim testified as to what the appellant's wife told him concerning her past misdeeds and the consequences to him if he did not assist her.
The investigating officer testified that he was told by "the people" at the scene of the crime that no one had been shot. This testimony was not prejudicial to the appellant's case. "Thus, even if the testimony was improper hearsay, the error was harmless because there was no prejudice to the appellant as a result. State v. Hicks, 133 Ariz. 64, 69, 649 P.2d 267, 272 (1982)." Williams v. State, [Ms. 1 Div. 611, July 15, 1986] (Ala.Cr.App.1986).
The State contends that the victim's testimony as to what he was told by the appellant's wife, was admitted to show intent, scheme, and motive. It is clear that the hearsay rule applies only to a statement offered for the truth of its contents. Tillis v. State, 469 So.2d 1367, 1370 (Ala. *849 Cr.App.1985); Dent v. State, 423 So.2d 327 (Ala.Cr.App.1982); Epps v. State, 408 So.2d 562, 564 (Ala.Cr.App.1981); Crews v. State, 375 So.2d 1291 (Ala.Cr.App.1979); Meriwether v. Crown Investment Corp., 289 Ala. 504, 268 So.2d 780 (1972). A statement offered for some purpose other than to prove the truth of its factual assertions is not hearsay. Bryant v. Moss, 295 Ala. 339, 342, 329 So.2d 538 (1976). See also Cory v. State, 372 So.2d 394 (Ala.Cr.App.1979); Epps v. State, 408 So.2d 562, 564 (Ala.Cr.App.1981). Thus, "utterances offered for some purpose other than to prove the truth of the out of court declaration fall outside the rule." Ex parte Bryars, 456 So.2d 1136, 1138 (Ala.1984). Where the statement's value does not depend upon its truth, its admission would not violate the hearsay rule. See E. Cleary, McCormick's Handbook on the Law of Evidence (2d ed. 1972), § 249, at page 590. Thus, a statement may be admissible where it is not offered to prove the truth of whatever facts might be stated, "but rather to establish the reason for action or conduct by the witness." Tucker v. State, 474 So.2d 131, 132 (Ala.Cr.App.1984), rev'd on other grounds, 474 So.2d 134 (Ala.1985). See also Tillis v. State, supra.
In the present case, the statements made between the victim and the appellant's wife were admissible, not to show the truth behind these statements, but rather to show the effect they had on the appellant's actions.
The appellant contends that statements of a third person, not made in his presence, are hearsay and inadmissible: "The key to the aforementioned argument and proposition of law is that the appellant should have a chance to cross-examine the witness testifying as to statements he has heard."
As stated in C. Gamble, McElroy's Alabama Evidence, § 242.01(1) (3d ed. 1977):
"The opportunity to cross-examine the witness is one of the major reasons for the hearsay rule. It has been held that the real value of cross-examination of a witness is the opportunity to test his (1) perception, sometimes called knowledge or opportunity to observe; (2) recollection, sometimes called memory; (3) narration, sometimes called accuracy; and (4) sincerity, sometimes called veracity."
Hayes v. State, 395 So.2d 127, 142 (Ala.Cr. App.1980). However, "[h]earsay does not include statements of witnesses in the present trial subject to cross-examination by the party against whom the statements are offered. Gray v. State, 364 So.2d 694 (Ala.Crim.App.1978); Hammock v. State, 401 So.2d 292 (Ala.Crim.App.1981); C. Gamble, McElroy's Alabama Evidence, § 242.01(1) (3rd Ed.1977)." Reeves v. State, 456 So.2d 1156, 1159 (Ala.Cr.App.1984).
"In two recent decisions of this court, the facts reveal that, at the trial of the defendants, the `parties that actually made the statements were present in court and had testified and were available for cross-examination.' Reeves v. State, 456 So.2d 1156 (Ala.Crim.App.1984), and Hammock v. State, 401 So.2d 292 (Ala.Crim.App.1981). Both of these decisions turned on the fact that the parties who made the statements, who were the victims in these two cases, were in court, served as witnesses, and had been available for cross-examination by the accused."
Sexton v. State, 460 So.2d 865, 867 (Ala.Cr. App.1984). In the present case, the appellant's wife was a witness for the defense and, thus, available for examination by the defense counsel.
"Moreover, these statements were incident to what was done and shed light on the main facts of the case. Therefore, this testimony was further admissible as part of the res gestae of the offense. Allen v. State, 382 So.2d 1147 (Ala.Crim.App.), cert. denied, 382 So.2d 1158 (Ala.1980); Williams v. State, 389 So.2d 151 (Ala.Crim. App.), cert. denied, 389 So.2d 154 (Ala. 1980); Bass v. State, 375 So.2d 540 (Ala. Crim.App.1979)." Reeves v. State, 456 So.2d 1156, 1159 (Ala.Cr.App.1984).

II.
The appellant claims that the trial court erred in allowing the State to question *850 him repeatedly concerning the invocation of his right to remain silent. At trial, the following transpired during the prosecutor's cross-examination of the defendant:
"Q: And did you talk to Sergeant John Wayne Boone?
"A: Yes, sir.
"Q: What did you tell him?
"Q: Really, nothing. He asked me a lot of questions.
"Q: What did you tell him?
"A: He asked me a lot of questions.
"Q: All right, then. When he asked you what happened what was your answer?
"A: He gave me the right to remain silent.
"Q: And what did you do?
"A: Remained silent.
"[Defense Counsel]: I'll object, Judge. He can't go into that. The man invoked the right to have counsel present.
"[Prosecutor]: Judge, not for impeachment purposes.
"THE COURT: He said he remained silent.
"[Prosecutor]: Not for impeachment purposes, Your Honor.
"THE COURT: He said he remained silent.
"[Prosecutor]: Okay.
"[Defense Counsel]: We would ask for an instruction, Judge."
The United States Supreme Court has addressed the issue of the inadmissibility of evidence of a defendant's silence, after he has been properly given his Miranda warnings at the time of arrest, in United States v. Hale, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975).
"Not only is evidence of silence at the time of arrest generally not very probative of a defendant's credibility, but it also has a significant potential for prejudice. The danger is that the jury is likely to assign much more weight to the defendant's previous silence than is warranted. And permitting the defendant to explain the reasons for his silence is unlikely to overcome the strong negative inference that the jury is likely to draw from the fact that the defendant remained silent at the time of his arrest.
"As we have stated before: `When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out.' Shepard v. United States, 290 U.S. 96, 104 [54 S.Ct. 22, 26, 78 L.Ed. 196] (1933)."
United States v. Hale, 422 U.S. at 180, 95 S.Ct. at 2138, further stated that although the issue of credibility where evidence is inconsistent ordinarily is left to the discretion of the trial court, "`where such evidentiary matter has grave constitutional overtones... we feel justified in exercising this Court's supervisory control.' Grunewald v. United States, 353 U.S. [391], at 423-424 [77 S.Ct. 963, at 983-984, 1 L.Ed.2d 931]." Id. at 180 n. 7, 95 S.Ct. at 2138 n. 7.
In Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Supreme Court held "that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." Doyle v. Ohio, supra, at 619, 96 S.Ct. at 2245. "[W]hile it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." Doyle v. Ohio, 426 U.S. at 618, 96 S.Ct. at 2245. The policy behind the inadmissibility of evidence of a defendant's invocation of his right to remain silent after he has been arrested and informed of his rights was examined by the United States Supreme Court in Hale as follows:
"At the time of arrest and during custodial interrogation, innocent and guilty alikeperhaps particularly the innocentmay find the situation so intimidating that they may choose to stand mute. A variety of reasons may influence that decision. In these often emotional and *851 confusing circumstances, a suspect may not have heard or fully understood the question, or may have felt there was no need to reply. See Traynor, The Devils of Due Process in Criminal Detection, Detention, and Trial, 33 U.Chi.L.Rev. 657, 676 (1966). He may have maintained silence out of fear or unwillingness to incriminate another. Or the arrestee may simply react with silence in response to the hostile and perhaps unfamiliar atmosphere surrounding his detention. In some, the inherent pressures of in-custody interrogation exceed those of questioning before a grand jury and compound the difficulty of identifying the reason for silence."
United States v. Hale, 422 U.S. at 177, 95 S.Ct. at 2137.
In the present case, there is an indication in the record that the prosecutor may have been attempting to use a prior inconsistent statement made by the appellant to the arresting officer after he had claimed his right to remain silent; those facts would have brought this case under the holding of Anderson v. Charles, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980). In Anderson, although the prosecutor, through his cross-examination of the defendant, elicited the fact that the defendant, after he was arrested and given the Miranda warnings, had claimed his right to remain silent, the Court determined that "[t]he questions were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement." Id. at 409, 100 S.Ct. at 2182. Furthermore, the Court found that "[s]uch questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent." Id. at 408, 100 S.Ct. at 2182. The prior inconsistent statement in Anderson was clearly introduced at trial through the testimony of the police detective to whom the statement was made. In the present case the following transpired during the prosecutor's cross-examination of the appellant, after evidence of his invocation of his right to silence was admitted into evidence:
"Q: All right. Where had youDid you tell John Wayne Boone [the arresting officer] that you had been to the store?
"A: No, I didn't, sir.
"Q: Okay. Didn't you tell John Wayne Boone that you came in through the front door?
"A: No.
"[Defense Counsel]: (Interposing): I'm going to object, Judge. He's already gone through a whole panoply about the maninvoked his right to remain silent. If he's got something, I'd ask him to show it to us.
"[Prosecutor]: You've seen it.
"[Defense Counsel]: I have not seen what you're talking about.
"[Prosecutor]: You certainly have seen it.
"[Defense Counsel]: I'd like to see it, Mr.Judge.
"THE COURT: Do you have something he hasn't seen?
"[Prosecutor]: No, sir.
"[Defense Counsel]: He's talking about
"[Prosecutor]: (Inaudible) gave it to him last week.
"[Defense counsel]: If this is supposedly what he told John Boone, I have not seen it, Your Honor.
"THE COURT: Well, show it to him.
"[Prosecutor]: I'll show it to him.
"(Discussion between counsel, off record.)
"Q: Okay. You never said that you had come home, and that you were with Lester Lett [the appellant's wife's brother], and that you have been to the store?
"A: No, sir.
"Q: You never said that?
"A: No, sir.
"Q: Okay. And you've never told Sergeant Boone that you came inside the house by the front door?
"A: No, sir."
Any indication from the above language that the prosecutor intended to impeach the *852 appellant by the introduction of a prior inconsistent statement, is not upheld by the record. Such a statement was never introduced into evidence, nor was there any testimony regarding such a statement by Sergeant Boone, the appellant, or any other witness. Thus, the Anderson holding is inapplicable to this case. See also Bradley v. State, 494 So.2d 750 (Ala.Cr.App.1985), aff'd, 494 So.2d 772 (Ala.1986).
Furthermore, because the appellant claims that he invoked his right to remain silent upon arrest, this situation is distinguishable from that of United States v. Fairchild, 505 F.2d 1378 (5th Cir.1975). The court in Fairchild held that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testified to an exculpatory version of events and claimed to have told the police the same version upon arrest. "In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest." Doyle v. Ohio, 426 U.S. at 620, n. 11, 96 S.Ct. at 2245, n. 11.
REVERSED AND REMANDED.
PATTERSON and TAYLOR, JJ., concur.
BOWEN, P.J., concurs in result only, with opinion, with TYSON, J., joining.
BOWEN, Presiding Judge, concurring in result.
I concur in the result reached by the majority but I would also reverse the conviction based on issue I. The statements of the defendant's wife to her spiritual advisor some ten hours before the defendant shot the spiritual advisor were hearsay, pure and simple, and were not admissible under any exception to the hearsay rule.
The wife's revelations to the victim could not, as the majority asserts, have been admissible, irrespective of their truth, to show the effect they had on the defendant's actions since the defendant did not hear the statements. See 6 Wigmore, Evidence § 1789 (Chadbourn rev. 1976) ("Knowledge, belief, good faith, reasonableness, diligence, motive, sanity, etc. as evidenced by receipt of information...."). (Emphasis added.)
In Roper v. State, 25 Ala.App. 397, 147 So. 201 (1933), the admission of details of a former difficulty between the assaulted party and the son of the accused, out of the accused's presence, was held to be error. The court observed the following:
"True, as pointed out in the cases diligently collected by the Attorney General, the general rule that the `details of a former difficulty cannot be inquired into' does not obtain `where the previous difficulty is a part of a continuous transaction which culminates in the act in question.'
"But we are of the opinion that the circumstances shown here do not warrant the application, to the testimony hereinabove alluded to, of the exception mentioned, to the `general rule'; here the `former difficulty' was not in the presence of appellant; he knew nothing of it, until some time after it had occurred. The language of the cases we have cited was never intended, we believe, to allow testimony against the `general rule' mentionedof details of former difficulties merely because, upon hearing of them, accused might have been thereby incited to action. To so hold would lead to endless confusion of issues in the trial of innumerable cases of this character." 25 Ala.App. at 398, 147 So. at 201-02 (citations omitted) (emphasis in original).
Under the same rationale, the evidence in the present case did not fall within the res gestae exception to the hearsay rule. See generally, Lovett v. State, 491 So.2d 1034 (Ala.Cr.App.), cert. denied, Ex parte Lovett, 491 So.2d 1039 (Ala.1986). The wife's conversation with her spiritual advisor occurred ten hours prior to the shooting, was not part of a "continuous transaction," Roper v. State, 25 Ala.App. at 398, 147 So. at 201, and was "merely narrative of a transaction which [was] really and substantially past." Bessierre v. Alabama City, G & A.R.R. Co., 179 Ala. 317, 330-31, 60 So. *853 82, 86 (1912) (quoted in Lovett v. State, supra).
The wife's testimony, "He know [sic] too much of my business. Shoot him. Kill him" was admissible as tending to show the fact, but not the details of her former revelations to the victim. See Roper v. State, 25 Ala.App. at 398, 147 So. at 202. Admission of the details of her conversation with the victim interjected irrelevant material into the defendant's trial for assault of this victim and led, as the Roper court noted, to "endless confusion of issues." 25 Ala.App. at 398, 147 So. at 202.