Shirley Latham Freeman was indicted for murder in violation of § 13A-6-2, Code of Alabama 1975. The jury found the appellant "guilty of manslaughter as charged in the indictment." She was sentenced to serve a term of life in the state penitentiary.
Charles Thomas, a long-time friend of the deceased, Ben Joe Evans, testified that the appellant was living with the deceased at the time of his death. He stopped by Evans' apartment at approximately 10:45 p.m. on June 19, 1984 and discovered Evans' body on the bed in the front bedroom, splattered with blood. He then called the police.
When Thomas first arrived at the apartment, he noticed that the screen on the front bedroom window was torn. He called for Evans and the appellant but there was no answer.
Thomas was renting an apartment next door to Evans. A young lady named Monica Haynes lived in the apartment. His relationship to her was as a "friend" and he was in the process of visiting her when he discovered Evans' body.
There were no lights on in Evans' apartment when he arrived. There was not much lighting around the apartment. He could not remember whether or not the front door was open when he arrived. It was unlocked when the police entered.
The police turned on the lights when they arrived. When Thomas arrived, there was some type of fabric covering the living room window and the bedroom window. However, the covering on the bedroom window had been thrown back. He became aware that the person on the bed was Evans *Page 1081 
after he inserted his hand through the screen and lit his cigarette lighter.
Voncille McCray, the victim's daughter, testified that her father had been living with the appellant prior to his death. On June 19, 1984 she saw the body of her father at the funeral home.
The next day, June 20, 1984, she spoke with the appellant, who denied having killed her father. The appellant told her that she did not find out that Evans was dead until 12 hours after he died. The appellant told McCray that she was awakened by her mother when the news of his death appeared on television. The appellant showed McCray the injuries to her leg which Evans had previously inflicted.
Annie Perkins, who lived four doors down from Evans, testified that she heard what sounded like firecrackers going off between 10:00 and 10:30 p.m. on June 19, 1984. She was watching the news at the time. She went to bed sometime later, between 10:00 and 11:00. Upon hearing the noise she looked out of the window but did not see anything unusual.
James Arthur Truss, an employee at Blocker Service Station on 6th Avenue South in Birmingham, Alabama, testified that the appellant and two men came to the service station at approximately 10:30 on the night of June 19, 1984. They were in a four-door Buick automobile that was dark in color. The appellant and the two men walked inside the station and asked where Blocker was. Truss told them that he had gone home, so they got back in the car and left.
Truss identified one of the men as Robert Furlow and identified the driver of the car as being this appellant. He testified that two small children were in the car as well. Truss had seen the appellant once or twice before at the service station in the car with Evans.
Elizabeth D. Briggins lived across the street from Evans' apartment on June 19, 1984. She testified that he was living with the appellant. She did not know either of them personally.
Briggins testified that on the night of June 19, 1984 she heard the sound of gunshots between 10:00 and 11:00 p.m. She then turned off the lights and television and went to the front door. She opened the door slightly and looked to see what was happening.
She testified that she saw the appellant in the appellant's living room, right across from Briggins', pacing back and forth. The door to the appellant's apartment was open. A light was on in the bedroom but there was no light on in the living room. The porch light was on.
Briggins testified that she saw two black men come from the back of the apartment and walk through the living room and out the front door. The appellant attempted to stop the two from leaving the apartment. The two men "pushed" past the appellant. They tore the screen off the window and one, or both of them, fired shots into the apartment. The two men then went back inside the apartment to the bedroom. Later the appellant and the two men left together. Another black woman, who had been with the others, went inside the apartment as the others left. Briggins later saw the police at the appellant's apartment.
Briggins testified that the front door to the apartment had glass on it on June 19, 1984. She could not remember whether or not there was a covering over the bedroom window.
The woman who stayed behind after the other three persons left the apartment was not the appellant. The woman went into the bedroom, turned the lights on and then off, shut the door and then left. Briggins did not discuss what she had seen with the police that night. Briggins stated that she knew the appellant because she had seen her in the neighborhood.
Jack R. Parker, a Jefferson County Deputy Coroner, testified that he was called to Evans' apartment sometime after 10:00 a.m. on June 19, 1984. He observed Evans lying on the bed on his back. He testified that he had the body transported to the coroner's office.
Parker stated that the police officers were on the scene when he arrived. He *Page 1082 
observed photos taken of the scene and testified that they depicted a covering on the window and the torn screen.
Terry Loggins, an evidence technician with the Birmingham, Alabama Police Department, testified that he arrived on the scene at midnight on June 19, 1984. He collected a live round of ammunition, three casings, one spent projectile and a metal fragment. He then turned the items over to the property desk at City Hall.
He collected no spent casings outside of the apartment in front of the window. He found two spent projectiles on the bed and one under the table on the floor.
Robert Brissie, M.D., the Chief Coroner and Medical Examiner in Jefferson County, Alabama, testified that he performed the autopsy on the deceased on June 20, 1984. Evans died from a small caliber gunshot wound to the head. Dr. Brissie observed two other bullet wounds in the body.
A blood alcohol test revealed a blood alcohol level of .10 grams percent. A .38 caliber slug was found in the night stand at the head of the bed.
Robert Walker, a homicide investigator with the City of Birmingham, was called to investigate the death of Evans on the night he died. He went to Evans' apartment on the night in question and secured the scene. He discovered a bullet hole in a dresser in the bedroom where Evans' body was found and a .38 caliber bullet casing in one of the drawers. There were no other bullet holes in the room.
Walker spoke with the appellant on June 20, 1984 at which time she told him that she had left Evans' apartment at approximately 8:00 on the night in question. She told him that she went to her mother's house and went to bed and did not get up until she received a call from Mrs. Thomas Fox asking her if she knew Evans was dead.
Walker estimated that the incident occurred between 10:00 and 11:30 p.m. on June 19, 1984. Mr. Truss told Walker that Christopher Latham, the appellant's brother, was one of the men with the appellant at the service station on the night in question.
Walker testified that an 85-year-old woman named Molly Coleman saw several black females and a male get out of a car near her house approximately 30 minutes after she heard a gunshot. The group walked down an alley toward Evans' apartment. A couple of minutes later the group came rushing back to the car. Ms. Coleman was unable to identify any suspects. Ms. Coleman described the car as being a 1978 Buick or Pontiac that was brown or black in color.
Walker testified that, through his investigation, he discovered that Robert Furlow was the appellant's ex-husband. The appellant told Walker that she and Evans had fought on June 19, 1984 and that Evans had beaten her and taken her car. She called the police, who later recovered her car for her. The appellant showed Walker the wounds she allegedly received from Evans.
Ollie Mae Aviles, Evans' ex-wife, testified, over the appellant's objection, that she spoke with Evans on the telephone at approximately 7:20 p.m. on the night of his death. He had called to speak to his daughter, Ms. McCray. Aviles testified that Evans asked her for a revolver and told her that the appellant "and her whole family was after him and said they would kill him." When she asked him why, he said that he did not have time to tell Aviles anything and had to "go find him some protection."
Aviles testified that she and Evans "were better friends than [they] were husband and wife." During the time they were married Evans had stuck her in the chest with a knife. While Aviles was at the funeral home she told the appellant about the phone call she had received from Evans before he died. The appellant replied, "Ollie Mae, I did not kill Ben." Aviles testified that the appellant drove a dark (navy blue or black) Buick LaSabre automobile.
The appellant's mother, Ruby Latham, testified that the first time she saw the appellant on June 19, 1984, it was approximately *Page 1083 
8:25 or 8:30 p.m. The appellant came to her house crying, with a black eye and blood on her legs, shoes and dress. She helped clean and tend to the appellant's wounds and sent her to the bedroom in the front of the house. She testified that the appellant did not leave the house again that night.
The next morning, at approximately 10:00, the appellant's daughter, Kimberly Latham, called to be picked up from school, so she and the appellant went to pick her up.
Later that afternoon, when Robert Walker came by the house, Ruby Latham became aware that Evans had been killed. Ruby Latham denied knowing about Evans' death before Walker came to the house. She stated that she may have heard of the incident on the radio, but did not know at the time that the victim had been Evans. Ruby Latham stated emphatically that she did not tell the appellant about Evans' death on the morning of the 20th of June, 1984.
The appellant's daughter, Kimberly Latham, corroborated the story that the appellant told Sergeant Walker. She stated that Evans had cut the appellant before with the same knife that he used to cut her with during the altercation which took place on the day he died.
Sergeant Robert Walker was recalled by the appellant and testified that James Truss had identified both Christopher Latham and Robert Furlow as having been at the service station with the appellant on the night in question.
The appellant testified that she stayed overnight at Evans' apartment very frequently and had stayed there the night before his death. She testified that on the day Evans was shot the two of them had been fighting. This occurred while the two of them were in the appellant's car.
They had stopped at a liquor store and Evans had obtained money from the appellant and purchased a half pint of whiskey. He then asked the appellant for more money but she refused and Evans then drove to Memorial Park. When they arrived there, Evans and the appellant started fighting. Evans took his pocket knife and beat her in the face. When the appellant tried to get out of the car, Evans prevented her from doing so and stabbed her in the leg with the knife.
Later Evans drove off in the car with the appellant's purse. The appellant called the police who later found Evans and returned the car to the appellant. She stated that she did not call her brother, Christopher, or Robert Furlow.
The appellant testified that after she left Evans she went to pick up her daughter at a friend's house and then went to her mother's house. Her mother treated her injuries and then the appellant went to bed.
She testified that she found out about Evans' death when Sergeant Walker came to her mother's house the morning after Evans' death.
 I
The appellant contends that the State's evidence was insufficient to support the jury's verdict. We disagree.
 "In reviewing the sufficiency of the evidence the appellate courts of this State are bound by several well settled rules. It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt and to a moral certainty. Instead, the function of this Court is to determine whether there is legal evidence from which a jury could by fair inference find the defendant guilty. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.), cert. denied, 368 So.2d 877 (Ala. 1979); Scruggs v. State, 359 So.2d 836, 842 (Ala.Cr.App.), cert. denied, 359 So.2d 843
(Ala. 1978).
 "In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State and accord the State all legitimate inferences therefrom. Ellis v. State, 338 So.2d 428
(Ala.Cr.App. 1976); Edson v. State, 53 Ala. App. 460, 301 So.2d 226 (1974). The evidence must be considered in the light most favorable to the prosecution. Colston v. State, *Page 1084 57 Ala. App. 4, 325 So.2d 520, cert. denied, 295 Ala. 398, 325 So.2d 531 (1975).
 "Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this Court has no right to disturb the verdict. Bell v. State, 339 So.2d 96 (Ala.Cr.App. 1976). A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust. Bridges v. State, 284 Ala. 412, 225 So.2d 821
(1969); Morton v. State, 338 So.2d 423
(Ala.Cr.App. 1976). There is a presumption in favor of the correctness of a jury's verdict, and when the trial judge declines to grant a new trial that verdict is strengthened on appeal. Tolliver v. State, 50 Ala. App. 654, 658, 282 So.2d 92 (1973)."
Johnson v. State, 378 So.2d 1164, 1169 (Ala.Cr.App. 1979). See also, Gilmore v. State, 339 So.2d 116 (Ala.Cr.App. 1976).
Although the evidence presented by the State was for the most part circumstantial, we believe that there was enough evidence from which the jury might have excluded every reasonable hypothesis except that of guilty of manslaughter beyond a reasonable doubt.
It was undisputed that the appellant and Evans had engaged in a violent quarrel several hours before Evans died. The appellant was beaten and suffered stab wounds at the hands of the victim on the day of his death. Indeed, the uncontroverted evidence showed that the appellant and Evans had engaged in such a violent quarrel on at least one previous occasion. "While not alone sufficient to justify a conviction, motive may strengthen circumstantial evidence." Cumbo, supra p. 876.
James Arthur Truss positively identified the appellant as having been in the company of a man named Robert Furlow and another man and woman at the approximate time during which the murder occurred.
Elizabeth Briggins positively identified the appellant as having been on the scene of the crime at the time that shotswere fired inside the victim's apartment. She corroborated Truss' story that the appellant was in the company of two males and another woman at the approximate time the murder occurred.
We are of the opinion that a jury question was also presented as to whether or not the shooting was the result of passion suddenly aroused by sufficient provocation. Blows and cuts such as those inflicted upon the appellant by the victim in this case prior to the shooting certainly may be considered as constituting sufficient provocation. Easley v. State, 246 Ala. 359, 20 So.2d 519 (1944); Stovall v. State, 34 Ala. App. 610,42 So.2d 636 (1949).
 II
The appellant contends that the trial court committed reversible error in admitting the testimony of Ollie Mae Aviles concerning her telephone conversation with the deceased on the night of the shooting. We must agree.
The admission of Aviles' testimony was clearly erroneous. The pertinent portion of the record follows:
"OLLIE MAE AVILES
was sworn and testified as follows:
"DIRECT EXAMINATION
"BY MR. NELSON:
"Q. Would you tell us your name, please.
"A. My name is Ollie Aviles.
 "Q. Okay. If you would, please spell your last name.
"A. A-v-i-l-e-s.
 "Q. And I'll ask you if you — Well, first of all, what area of town do you live?
"A. I live in the western section of Birmingham.
 "Q. And I'll ask during his lifetime did you know Ben Joe Evans?
"A. Yes. I was married to him. *Page 1085 
"Q. Okay. When were you married to him?
"A. 1952, June 20th.
"Q. Until when?
"A. 1954, April, I'm not sure.
 "Q. Do you recall — When did you first learn of his death?
 "A. About 10 o'clock the following morning on my job, my sister called me and told me he was dead.
 "Q. Okay. On that brief evening had you had an opportunity to talk —
"MR. SHEFFIELD: Mr. Nelson, excuse me.
 "Your Honor, I think we need to approach the bench.
"(There was a side-bar conference off record.)
"THE COURT: Go ahead, Mr. Nelson.
 "Q. On the evening prior to learning of Ben Joe's death, did you have occasion to have a conversation with him?
 "A. Yes. "MR. SHEFFIELD: We're going to object to any conversation that she might have had with Ben Joe Evans unless and until it's been shown that it falls outside the hearsay rule in that the matter alleged to have been said was within a period of time sufficient under the law to make an exception to the hearsay rule—
"THE COURT: The objection is overruled.
"MR. SHEFFIELD: Excuse me.
 "— close enough or further away from the shooting of Ben Joe Evans himself.
 "THE COURT: The objection is overruled, and I'll give you a continuing objection on those grounds as to any of the statements made.
 "Q. Approximately what time did you talk with Ben Joe?
 "A. I talked with him about 7:20 the night before — I mean the night he was killed.
 "MR. SHEFFIELD: 7:20, you say? I'm sorry. Did you say 7:20?
"THE WITNESS: Yes.
"MR. SHEFFIELD: Well, we renew our objection.
"THE COURT: Overruled.
"Q. And how did you talk with him?
 "A. He called me at my home looking for my daughter. He asked me if she was there.
"Q. Who was he asking for?
"A. He asked for Voncille.
 "Q. Okay. Did you have a further conversation with him?
"A. Yes.
 "Q. All right. Tell the ladies and gentlemen of the jury what he said.
 "MR. SHEFFIELD: We want a continuing objection to every question and every response of this witness.
 "THE COURT: You have it. Such an objection is overruled.
 "A. He asked me for a revolver, and I asked him what did he want with the revolver. He said he needed to protect himself. I asked him, "Who do you need protection from?" He said that Shirley and her whole family was after him and they said they would kill him, were going to kill him. And I told him that I wasn't going to give him a gun, and he said that — I asked him what did he do to Shirley or why did they want to kill him. So he said that he didn't have time to tell me anything, that he had to go and find him some protection. So he hung the phone up."
 "MR. NELSON. That's all I have, Your Honor." R. 310-312) (emphasis added)
The law is well settled in Alabama that "[s]tatements and declarations of a deceased are not competent evidence for or against an accused in a murder prosecution unless made in his presence, or unless they are admitted in evidence as part of the res gestae or constitute dying declarations." (citations omitted) Hargrove v. State, 368 So.2d 335 (Ala.Crim.App. 1979), See Ex Parte Bryars, 456 So.2d 1136 (Ala. 1984). Cf.Lovett v. State, 491 So.2d 1034 (Ala.Crim.App. 1986), cert. denied, 491 So.2d 1039 (Ala. 1986) (expressly reserving approval of "all the language, reasons, or statements of law in the . . . opinion".)
The State argues that this hearsay testimony falls within the dying declaration *Page 1086 
exception. We find this argument to be completely without merit.
The circumstances surrounding the conversation clearly indicate that Evans lacked a "settled, hopeless expectation of impending death," at the time the statements were made. See C. Gamble, McElroy's Alabama Evidence, 248.01(1) (3rd ed. 1977). Indeed the fact that Evans had telephoned for the purpose of obtaining a gun for "protection" points to the inescapable conclusion that he did, in fact, have at least some hope that he would live, or else he would not have tried to defend himself. Furthermore, Evans was not wounded at the time he made the statement several hours before his death. See Lehr v.State, 398 So.2d 791 (Ala.Crim.App. 1981); Bell v. State,402 So.2d 1 (Ala.Crim.App. 1981); James v. State, 366 So.2d 1155
(Ala.Crim.App. 1979).
Neither do these statements, made by the victim several hours
before his death, fall within the "res gestae" exception. "To be admissible as res gestae, the declaration (sic) of a deceased person must have been made at such a time and under such circumstances as to be part of the transaction which they purport to explain, although they need not have been made under the sense of impending death. . . ." Lovett, supra p. 1036. SeeBryars, supra (similar statement made by victim held inadmissible as not falling within exception for declarations made by "one setting out on a journey or immediately prior thereto"); Stockard v. State, 391 So.2d 1049 (Ala.Crim.App. 1979), rev'd, 391 So.2d 1060 (Ala. 1980), on remand,391 So.2d 1065 (Ala.Crim.App. 1980). See also Hill v. State,339 So.2d 1077 (Ala.Crim.App.), writ denied, 339 So.2d 1082 (Ala. 1976); McAdams v. State, 378 So.2d 1197 (Ala.Crim.App. 1979).
Furthermore, the State made no effort to lay the proper foundation for the admission of this testimony.
We are of the opinion that the inadmissible evidence of the contents of this telephone conversation cannot be dismissed as harmless or cumulative. See Bryars, supra.
The substance and damaging aspect of the conversation was Evans' claim that the appellant had told Evans that she and her family were going to kill him. This was, in fact,double hearsay. Certainly hearsay testimony such as this, which bears directly on the issue of the guilt of the defendant, cannot be considered harmless. Bryars, supra.
We cannot say that this testimony is "merely cumulative of other testimony to the same effect." Lovett, supra. This case is factually distinguishable from Lovett.
In Lovett this court held that the admission of a victim's written note which included an expression of the victim's fear for her life, written shortly before she was killed, was harmless error because it was cumulative of other testimony. In that case the victim's daughter had testified that she had been afraid that the appellant was going to shoot her mother because of the appellant's behavior shortly before the mother was killed.
In the case at bar, there was no other evidence presented to the effect that Evans had received threats against his life from the appellant or her family. The erroneous admission of this testimony, when considered in light of the rest of the evidence presented was, therefore, highly prejudicial to the appellant in this cause. Error resulted.
For the above-stated reasons, the judgment of the trial court is, hereby, reversed and the cause is remanded.
 REVERSED AND REMANDED. All the Judges concur. *Page 1205